GRAINGER, by Guardian, Appellant, v. CHARLES E. STILL.

**Division One, March 15, 1905.**

1. **MALPRACTICE: Hip Disease: Other Diseases.** It is no defense to a charge of malpractice that the patient had another disease and that the same results would have ensued from that disease had not the defendant employed the improper treatment.

2. ———: ———: ———: **Expert Testimony.** Where the patient had only incipient hip disease, no expert opinion is needed to show to the common sense of mankind that a treatment for dislocation by a violent wrenching of the ligaments and tendons and by forcing the femur into the socket and by rotating the parts so suddenly and violently as to result in fever and great soreness, is improper.

3. ———: ———: **Dislocation: Prima Facie Case.** Plaintiff makes out a prima facie case of malpractice entitling her to go to the jury upon a charge and showing that defendant diagnosed her case as a dislocation of the hip and unskillfully and violently treated her for a dislocation when she did not have hip dislocation.

4. ———: ———: **Osteopaths: Testimony of Physicians.** If it be true that osteopaths teach the same text-books as other schools of medicine, then physicians of other schools are competent witnesses to express an opinion as to the correctness of the diagnosis and treatment of hip disease by an osteopath. On the other hand, if osteopaths have no fixed rule of practice for the treatment of hip disease which all osteopaths must adhere to, then they do not constitute a school of medicine, and hence, regular practitioners of medicine and surgery are competent witnesses to testify as to the correctness of a diagnosis and treatment of hip disease by an osteopath.

5. ———: ———: ———: ———: **Diagnosis: Treatment.** Plaintiff charged that she was negligently, unskillfully and improperly treated for hip dislocation by an osteopath, when she had no hip dislocation, and after defendant had at the time of the diagnosis stated that she did not have hip disease—a defense he sets up to her suit for malpractice. *Held*, that as hip disease is ascribed to the same causes, and the diagnosis of the case is the same, by both osteopaths and physicians and surgeons of every school of medicine, and the same being true

of hip dislocation, a physician of any school is a competent witness to testify whether plaintiff had hip disease, dislocation, or as to any other diagnosis of any disease. But they are not competent to express an opinion as to the correctness of the proper treatment of either, unless it appears that both of the schools to which the witnesses and the defendant belong employed the same treatment.

Appeal from Adair Circuit Court.—*Hon. Nat. M. Shelton,* Judge.

REVERSED AND REMANDED.

*Millan & Greenwood* and *G. C. Weatherby* for appellant.

(1) The court erred in giving the peremptory instruction to the jury to find for the defendant. In passing on a demurrer to this evidence, every reasonable deduction to be drawn therefrom which tends to sustain the cause of action set forth in the petition should be considered as absolutely true. Pauck v. Dressed Beef & Provision Co., 159 Mo. 467. (2) As this case was not permitted to go to the jury we must assume they would have found all the facts in plaintiff's favor that any reasonable view of the evidence would permit. Pike v. Hornsinger, 63 Am. St. 655. (3) The different schools of medicine are not recognized as such in the courts. All systems of medicine are recognized in law. As such the physician is required to regulate his practice according to the system he follows. It is true, however, that certain principles of medicine are so well known and universally received that to ignore them would be negligence in law, no matter what the practice might be in the particular school to which the physician might belong. Barrows on Negligence, pp. 377, 378; Nelson v. Harrington, 40 N. W. 228; Longan v. Weltmer, 180 Mo. 322. (4) To constitute a school of medicine it must have rules and principles of practice for the guidance of all its mem-

bers, as respects principles, diagnosis, and remedies which each member is supposed to observe in any given case. Nelson v. Harrington, 40 N. W. 231. (5) The general rule of law is that a physician or surgeon or one who holds himself out as such, when he accepts an employment to treat a patient professionally, must exercise such reasonable care and skill as is usually possessed and exercised by physicians or surgeons in good standing of the same system or school of practice, in the vicinity of his practice, having due regard to the advanced state of medical or surgical science at the time. This rule is elementary. (6) By law, osteopathy in this State is defined not to be the practice of medicine and surgery within the meaning of section 8537, Revised Statutes 1899.

*C. E. Murrell* and *Campbell & Ellison* for respondent.

(1) There was a total failure to prove the allegations of the petition. Boiled down, the petition charges that defendant engaged to treat plaintiff for a partial dislocation of the right hip joint. There is no attempt in the record to prove that the method employed by the defendant in treating plaintiff was improper, in the reduction of partial dislocation. The only attempt upon the part of plaintiff, to show want of care and skill in the treatment of plaintiff by defendant, was to show that the method of treatment adopted by the defendant was improper treatment for hip joint disease. Hip joint disease is tuberculosis—consumption—of the hip joint. Plaintiff will not be permitted to allege the unskillful treatment of one ailment, and recover for the unskillful treatment of a totally different ailment. There is no charge against defendant that he was negligent in treating hip joint disease, and proof that he was negligent in treating hip joint disease is not proof that he was negligent in reducing a partial dislocation.

In action for negligence the evidence should correspond to the specific negligence charged. Harty v. Railroad, 95 Mo. 368. Where the plaintiff alleges a specific act of negligence, there can be no recovery for any other negligence. Price v. Railroad, 72 Mo. 414; Bohn v. Railroad, 106 Mo. 429; O'Brien v. Co., 100 Mo. 182. (2) This is an action for malpractice against an osteopathic physician. Malpractice is bad practice; that is, practice not according to the rules of the school to which the physician belongs. It being an action for malpractice, it is peculiarly a case for expert evidence. All the authorities agree that no matter what the result of the treatment of the physician may be, such result is not of itself evidence of malpractice; and before the physician can be held liable for malpractice, there must be evidence of negligence or unskillfulness. Whether the treatment adopted is negligent or unskillful must and can only be determined by the rules of the particular school to which the physician belongs. Patten v. Wiggins, 51 Me. 594, 81 Am. Dec. 593; Martin v. Courtney, 77 N. W. 813; Force v. Gregory, 63 Conn. 167, 22 L. R. A. 343; 1 Green (Iowa) 441. The Legislature has put the question at rest as to whether osteopaths have a rule and method peculiar to themselves, by declaring that osteopathy is not the practice of medicine. The petition charges that plaintiff undertook to treat the patient osteopathically, that is, by a method that was neither the practice of medicine nor surgery, and before he could be held to a negligent or unskillful treatment, according to that method (the lawmaking power having recognized that they have a method) it would be incumbent on the plaintiff to show that the treatment was not in accordance with the rules taught in osteopathic schools. (3) The fact that a patient is injured by a physician is no evidence of malpractice, "the mere fact that the patient grew worse under the physician's treatment, and became better when his services were dispensed with, is no evidence of malprac-

tice." Wurdemann v. Barnes, 92 Wis. 206; Wood v. Baker, 49 Mich. 295; Sims v. Parker, 41 Ill. App. 284.

MARSHALL, J.—This is an action to recover ten thousand dollars damages, for malpractice.

At the close of the plaintiff's case the court sustained a demurrer to the evidence, the plaintiff stood upon the ruling, the jury returned a verdict for the defendant, and, after proper steps, the plaintiff appealed.

The petition alleges that the plaintiff is a minor, of the age of seven years; that her father is dead, and that she prosecutes this case by her duly appointed guardian; that prior to the twenty-first of September, 1895, she was afflicted with a slight stiffness in her right hip, but it was not sufficient to make her lame or to cause her pain or to materially interfere with her locomotion; that at said date the defendant held himself out as the president of the A. T. Still Infirmary, at Kirksville, in Adair county, and as a practicing osteopathic physician and surgeon, and as competent, qualified and able to treat and reduce fractured, dislocated bones, nerves, muscles and blood vessels, and to treat all such dislocations successfully and to reduce them osteopathically; that on said date the defendant "made an examination of plaintiff's hip and diagnosed her disease and pronounced it a partial dislocation of her right hip joint; that defendant assured plaintiff and her parents at that time, that the reduction of said partial dislocation was a matter attended with no danger and readily and easily performed and that he could reduce said partial dislocation without injury to plaintiff;" that in consideration of the sum of twenty-five dollars paid to the said infirmary, the defendant "undertook to treat plaintiff for said so-called partial dislocation of her hip; that the defendant represented and stated to plaintiff and her parents that he would treat the muscles and tendons about plaintiff's right hip osteopathically until they were sufficiently relaxed before he

could reduce said so-called partial dislocation of plaintiff's said right hip joint; that defendant from the date aforesaid did manipulate the muscles, tendons and blood vessels about plaintiff's right hip joint until about November 10, 1895, when he determined that muscles and tendons about plaintiff's right hip were sufficiently relaxed, and he then and there undertook to reduce the so-called partial dislocation of plaintiff's right hip.

"That in attempting to reduce said partial dislocation so-called of plaintiff's hip joint the defendant negligently, carelessly and unskillfully took plaintiff by her right ankle with one of his hands and about the knee with the other hand and with force and violence negligently, unskillfully and carelessly forced plaintiff's right leg upwards, towards and against her body with such force and violence and so negligently, carelessly and unskillfully, that he gave to plaintiff's said right hip joint a complete, upward and backward dislocation. Plaintiff states that defendant did not reduce the said so-called partial dislocation of her right hip, but on the contrary the defendant so carelessly, negligently and unskillfully treated and managed plaintiff's disease and injury to her right hip that he permanently dislocated the same and by defendant's careless, negligent and unskillful conduct in treating plaintiff's right hip not only permanently dislocated the same, but injured, stretched and tore the muscles, nerves, tendons and blood vessels connecting with plaintiff's right hip joint and as a result of defendant's said negligent, careless and unskillful treatment the plaintiff was thrown into a violent fever which continued for a long space of time and she was made sore, sick and to suffer great anguish and pain.

"That as a result of the careless, negligent and unskillful conduct and treatment of plaintiff's disease by defendant, her spine has become curved and her right leg rendered entirely useless and shorter than the

other and is gradually perishing, thereby rendering her maimed and deformed for life and permanently injured and her general health greatly impaired. Plaintiff further states that from November, 1895, until April, 1899, at the special instance and request of the defendant she remained at the city of Kirksville aforesaid taking osteopathic treatment under the direction of the defendant for her said hip and until defendant refused to longer treat her and discharged the plaintiff.''

The answer denies generally all the allegations of the petition, not expressly admitted, and then admits that the defendant is an osteopath, and that he treated the plaintiff osteopathically, and then alleges that at the time she was so treated, she ''was afflicted with hip joint disease and a partial dislocation of the hip joint, all of her right hip as defendant then and now verily believes.''

The case made by the plaintiff was this:

In September, 1895, the plaintiff was a minor, aged about three years and eight months, and lived with her parents in Plymouth, Illinois. She was a strong, fat and healthy child, and had never required the services of a physician, except when teething. Her mother discovered a slight stiffness in her right hip, when she stooped to pick up anything from the floor. She examined her hip, but could discover nothing the matter with it, and no soreness or tenderness. She had her examined by the family physician, Dr. McDaniel, and by Dr. Aiken, and they found no soreness or tenderness about the hip, but only a little stiffness when she stooped, and said that there was no dislocation, but were of opinion she might develop hip disease. Her parents took her to Kirksville, to the defendant's infirmary, for examination. The defendant examined her, and told her mother that she had a partial dislocation of the hip, and that they handled cases of that kind successfully in two weeks, but she had better take a month's treatment. He further told her parents that she did not

have hip disease. Her mother told him that her family physician said it might develop into hip disease, that her husband's people were consumptive, and she thought her father's condition might cause hip disease to develop in the child. The defendant examined her husband, but did not make a thorough examination, and said the child seemed hearty and well, and assured her mother that the child did not have hip disease, but that it was simply a dislocation. Thereupon plaintiff's parents took out a treatment card for a month, paying twenty-five dollars therefor. On the following Monday, the plaintiff's treatment by defendant began. It consisted of kneading the hip with the ends of his fingers and "rotating" the limb in the hip joint. The treatment lasted only three or four minutes. The plaintiff manifested no pain from the treatment. She boarded ten or twelve blocks from the infirmary and walked back and forth every time she went for treatment, and exhibited no trouble or pain in so doing. The treatment was kept up three times a week for a little over a month, and then the defendant told her mother the hip was ready to be put back into place. On the day appointed the plaintiff walked from her boarding house to the infirmary as usual and was in good condition. The defendant performed the operation, which is described by the mother as follows: "He took hold of her hip, the end of her hip, with one hand a little above the knee and the other hand about her ankle, kind of brought the limb around and pushed it right up to the body, and that was all there was to it." When taken off of the operating table she seemed hurt, cried, acted as if she could hardly catch her breath, could not stand up, and sank down on the floor. She was taken back to the boarding house in a cab, crying and moaning all the time. She was put to bed, suffered great pain and acted as if she was going into convulsions. The plaintiff's mother sent for the defendant the next day, and he came and said he had put the hip into position, and

"that he had given the ligaments an awful stretch;" that she would not be able to walk for several days, and that she was then too sore to be treated further at the time, but that the mother need not worry about her. She had high fever and would scream with pain if she was touched, but the defendant did nothing then for her. The fever continued, the skin dried up and flaked off like it had been burned, and she had to be carried on a pillow for six weeks. The defendant came to see her four or five times within the next six months thereafter, but gave her no treatment. This was in November, 1895. By direction of "old Dr. Still" the mother then took plaintiff home for two months. Then she returned and the defendant treated her for about a month, and then turned her over to other operators at the infirmary, who treated her for about four months, when they sent her home for a rest. She returned again in February, 1897, and was treated for seven months, by said other operators, and was again sent home for a rest. She remained there, on their advice, for about a year, when, at their direction, she returned to Kirksville. The mother told defendant she did not see any use of their treating her daughter any longer, but he said if she would let him treat her for four months longer, he thought he could "restore her limb." He treated her for that time, but she got no better. The mother then asked him how he got her in that shape, and said her father had died, and asked him if he would not help her take care of the child and educate her, and he said he would not treat her another time unless she paid him for it, which she refused to do.

The child has never been able to walk since; her leg is shrunken, and it is about four inches shorter than the other, and she has to use crutches, and she stammers when she tries to talk. She was under the treatment of the defendant or said other operators from September, 1895, to April, 1899.

Other witnesses for the plaintiff also testified to

the child's condition before the defendant began to treat her and since, and as to defendant's statements to her parents that she did not have hip disease, but was suffering from a partial dislocation of the hip. Ollie Merrill, a witness for plaintiff, and at whose house she boarded, said that the day after the operation the defendant told her that "he had pushed the limb up into the body and made it go whether it wanted to or not."

Dr. McDaniel testified that he was the family physician at Plymouth, Illinois, and had known the plaintiff all her life; that he examined her before the defendant treated her in September, 1895, and found her a healthy, well-grown child; that, "there was a slight stiffness in her right hip, not sufficient, however, to be discovered in her walk, but when she would stoop over one could discover by her motion there was a slight stiffness in her hip; there was no soreness about her hip; she did not shrink from pressure;" that he knew her father was afflicted with tuberculosis and scrofula, and concluded the child might develop hip disease; that he saw her again in April or May, 1896, after the operation, and that "she could not walk a step and could not bear the least pressure on or about her right hip unless she manifested great pain;" that her condition was brought about by some other cause than hip disease.

Dr. Aiken testified to the same effect, except he said that when he examined her before the operation, "her right leg was the thickness of her shoe longer than the left."

The plaintiff also called as witnesses Dr. C. B. Clapp, of Moberly, Missouri; Dr. G. A. Goben, of Kirksville, Missouri; Dr. E. S. Quinn, of Kirksville, and Dr. E. A. Grimm, of Kirksville. They were all regular physicians and surgeons, and graduates of the Allopathic School of Medicine, and all practicing that system, except Dr. Goben, who is a regular graduate of said school, but who he said he belonged to no "pathy,"

but practiced whatever he found to be most beneficial to the patient without regard to what school or system taught it. They are all physicians of good standing and of long experience, and had treated hip diseases, and dislocations of the various bones of the human body.

The defendant objected to the testimony of these witnesses on the ground that they were not competent, because they belong to a different school or system from that to which he belongs, and that his treatment can only be judged by members of his special school or system. The court overruled the objections and permitted the witnesses to testify.

The sum of their testimony is, that there is a great difference between hip disease and a dislocation of the hip joint; that any competent physician can easily and correctly diagnose a case of hip disease; that there are three stages of the disease; that hip disease is caused by tubercula, and may ensue in the child from consumption or scrofula of the parent; that inflammation or pus forms in the hip joint, which manifests itself by soreness and pain when pressure is applied; that "in the early stages there is a slight stiffness, usually some pain, generally crying out at night in the sleep, contraction of the muscles and pain caused from inflammation, child or person will start from sleep, and some disturbance in the locomotion;" that it usually reveals itself between the ages of six and twelve; that there is no such thing as partial dislocation of the hip in the early stages of the disease; that after the bony tissue of the head of the femur or the rim of the acetabulum have become destroyed by inflammation, the head of the femur may slip out, or partially out, of the cup-shaped acetabulum, but not before; that from the condition of the plaintiff prior to the operation, they are of opinion that she was in the first stage of hip disease, but that there was no partial dislocation of the hip; that when a patient is treated while in the first stages, the disease

may be arrested; that deaths from hip disease range from seven to thirty-seven per cent of the cases; that the proper medical treatment is "as complete mobilization of the parts as possible, with extension or contraction of the limb," so as to prevent friction between the head of the femur and the socket in which it rests; that the purpose of the treatment is to permit the bones to anchylose, that is, the head of the femur and the acetabulum to grow together, and to cause them to grow together straight so that the person may be able to use the leg, notwithstanding it may be stiff at the hip; that the disease usually results in a shortening of the leg, of an average of three or four inches, and that in consequence there is a "compensatory curvature of the spine;" that when a patient has hip disease, it is improper treatment to "rotate" or move the leg or hip joint; that from their examination of the plaintiff and from the history of the case given in evidence, they were of opinion that she was in the first stages of hip disease and did not have partial dislocation of the hip; that her present condition is not the result of hip disease, but of traumatism, that is, an injury resulting from accident or violence to the hip; that she is unable to walk, and that while the hip disease seems to be arrested, or cured as it is generally called, her leg is turned out at an angle of forty-five degrees, instead of being straight as it should be.

For the purposes of this case this is a sufficient statement of the facts and of the medical expert testimony.

At the close of the plaintiff's case the defendant demurred to the evidence. Before the court passed on the demurrer, the plaintiff asked leave to introduce evidence to show that the text-books used in the American School of Osteopathy are the same as used in the other medical schools in Missouri and other medical institutions and that the osteopaths have no fixed rule of practice for the treatment of hip disease. The court

treated the offer as proved, and sustained the demurrer to the evidence, the plaintiff saved an exception and appealed.

The case stated in the petition is, a diagnosis by the defendant that the plaintiff had partial dislocation of the hip and not hip disease, treatment by the defendant for partial dislocation, and negligence and unskillfulness in both respects; and the defense is a general denial; an admission that he treated the plaintiff, and an affirmative plea that the plaintiff was afflicted with hip disease and a partial dislocation of the hip.

The plaintiff tried the case upon the theory that the defendant's diagnosis was incorrect, and that she had hip disease in its primary stage, and did not have partial dislocation of the hip, and that the defendant treated her for partial dislocation, and that such treatment was improper in view of her having hip disease, and that defendant's treatment was further negligent because it left the leg turned out at an angle of forty-five degrees, instead of straight as it should have been whether treated for dislocation or hip disease.

The defendant tried the case upon the theory, first, that the plaintiff had hip disease and partial dislocation, and, second, that she showed no damage because the same results would have ensued from hip disease, and that the treatment for partial dislocation did no injury.

The defendant's chief contention, however, is that he is an osteopath, and that the expert witnesses introduced by the plaintiff belong to different and hostile schools or systems from his, and, therefore, are not competent to give an opinion in the case, but that he must be judged only by the persons of his own school or system, and while the record does not show that the court acted upon this theory in sustaining the demurrer to the evidence, counsel seem to agree that this was the chief reason for the ruling.

## I.

The contention of the defendant that the plaintiff showed no damage because she had hip disease and the same results would have ensued therefrom, and that the treatment for partial dislocation did no injury, is untenable.

If plaintiff had hip disease, it was in the primary stage. There was no inflammation, or pus, or sensitiveness to pressure, and hence no dislocation attributable to that disease, for dislocation resulting from hip disease could not occur until the ravages of the disease had destroyed the head of the femur or the rim of the acetabulum to such an extent that the femur would slip out of its socket, and there is nothing in this case which affords any countenance to any such theory of the case.

But whether this was so or not, it needs no expert opinion to show to the common sense of mankind that it could not do hip disease any good to be treated as the testimony of the lay witnesses shows that the defendant subjected the plaintiff to. A diseased hip could not possibly be benefited by giving the ligaments of the hip "an awful stretch," and forcing the femur into the socket whether it wanted to go or not, as the lay witnesses say the defendant said he did to the plaintiff's leg. It stands to reason that inflammation is not cured or bettered by irritation or by rotating the parts so suddenly and violently as to result in fever and great soreness. If the plaintiff had hip disease, it was in the first stages and therefore she stood a better chance of having the disease arrested or cured by proper treatment, than she would stand after her hip had been subjected to the violent treatment that the defendant subjected it to. It is too plain to admit of argument or serious question, that it does not lie in the defendant's mouth to say that the same results would have ensued from hip disease even if he had not treated her as he did. It could as well be argued that, where a patient is

improperly treated for a fracture of a limb and gangrene sets in and the patient dies, the physician is not liable because the patient had consumption and would have died anyway. A patient, however afflicted, is entitled to let nature take its course, and not have even natural consequences precipitated by the improper treatment of the physician, or by an improper diagnosis and hence an improper treatment applied.

## II.

The defendant also pleaded that the plaintiff had both hip disease and partial dislocation of the hip joint.

Of course it is possible that one may have both hip disease and partial dislocation of the hip joint at the same time, and it is also possible that the dislocation may be the result of the advanced stage of the hip disease or from an accidental cause. But it is perfectly manifest to common sense that if the dislocation was the result of the ravages of the hip disease which had so destroyed the head of the femur, or the rim of the acetabulum, that the femur would slip out of its socket, it could easily be slipped back into place without any violence, and that it would be necessary to use some kind of an appliance to keep it in place until the bones anchylosed, and as the defendant did nothing of this kind it must be assumed that he did not intend by his pleading to say that the partial dislocation was the result of the hip disease, but that it was traumatic.

If it was traumatic, it was necessary and proper to reduce the dislocation, whether the patient had hip disease or not, for if it was not done the bones would not grow together straight and hence the usefulness of the limb would be greatly impaired after the hip disease was arrested or cured. Upon this assumption, the defendant would not have been guilty of any negligence, for the manner of the doing of it is not an unusual way of reducing such a dislocation, and in fact is in effect the only way of doing so, the only practical difference

between the way in which defendant did so, and the use of the pulleys and the Jarvis adjuster spoken of in Vanhooser v. Berghoff, 90 Mo. l. c. 492, is that the defendant used his hands, while the pulleys and the Jarvis adjuster are mechanical appliances. The purpose of both is the same, to-wit, to draw the head of the femur away from the hip socket, so that it will "slip" or "snap" back into place.

But the gravamen of the plaintiff's case is that the defendant was guilty of malpractice, in that, he diagnosed her case as a partial dislocation and said she did not have hip disease, and that he treated her for a dislocation when there was no dislocation, and hence no necessity or excuse for such treatment.

In support of her case the plaintiff introduced lay witnesses who testified to the child's condition before the operation, which was such as would appear not to be even a partial dislocation, and to the diagnosis made by the defendant, and his statements and assurances to her parents that she had a partial dislocation and did not have hip disease, and also the testimony of Doctors McDaniel and Aiken, who examined her before the operation, as well as afterwards, which was admitted without objection so far as the record shows, and who said she did not have any dislocation of the hip whatever.

This testimony made out a prima facie case, which entitled plaintiff to go to the jury, and cast upon the defendant the necessity of overcoming it, and making out his defense. This results without taking into consideration at all the testimony of the plaintiff's expert medical witnesses, whose testimony the defendant objected to.

### III.

The defendant objected to the testimony of Doctors Clapp, Goben, Quinn and Grimm, the medical experts called by the plaintiff, "because it was not shown

that they had any knowledge or information as to the method prescribed, taught or practiced by osteopaths for the treatment of hip joint disease, and because the question as to whether the treatment administered by the defendant was correct or incorrect must be determined by the rules and methods of osteopaths and not by the methods or mode of treatment taught and practiced by allopathic physicians.'' The court overruled the defendant's objection and admitted the testimony, but the court afterwards sustained the demurrer to the evidence, and counsel concede that it was for the reason expressed in this objection that the court so ruled, and it must have been for this reason, as there is none other perceivable in the record.

The duty and liability of a physician or surgeon to a patient, and what constitutes malpractice, is thus stated in 22 Am. & Eng. Enc. Law (2 Ed.), p. 798 et seq:

''Malpractice is the bad professional treatment of disease, pregnancy, or bodily injury, from reprehensible ignorance or carelessness, or with criminal intent.

''A physician, surgeon, dentist, or other medical practitioner offering his services to the public as such impliedly contracts that he possesses and will use, in the treatment of his patients, a reasonable degree of skill and learning, and that he will exercise reasonable care and exert his best judgment to bring about a good result. A failure to perform this contract renders him liable for injuries caused to the patient thereby.

''The standard by which the degree of care, skill and diligence required of physicians and surgeons is to be determined is not the highest order of qualification obtainable, but is the care, skill and diligence which are ordinarily possessed by the average of the members of the profession in good standing in similar localities, regard being also had to the state of medical science at the time.

''Unless it is so provided by an express contract,

the physician or surgeon does not warrant that he will effect a cure or that he will restore the patient to the same condition in which he was before the necessity for the treatment arose, or that the result of the treatment will be successful.''

The same work, at page 801, then says:

''The law, in the absence of a special statute, does not give exclusive recognition to any particular school or system of medicine, and the question whether or not a practitioner in his treatment of the case exercised the requisite degree of care, skill and diligence is to be tested by the general rules and principles of the particular school of medicine which he follows, not by those of other schools.

''A school of medicine to be entitled to recognition under this rule must have rules and principles of practice for the guidance of all its members, as respects principles, diagnoses, and remedies, which each member is supposed to observe in any given case. A class of practitioners who have no fixed principles or formulated rules for the treatment of diseases must be held to the duty of treating patients with the ordinary skill and knowledge of physicians in good standing.''

In support of the doctrine of the text the following cases are cited: Force v. Gregory, 63 Conn. 167, 38 Am. St. Rep. 371, 22 L. R. A. 343; Bowman v. Woods, 1 Greene (Iowa) 441; Patten v. Wiggin, 51 Me. 594, 81 Am. Dec. 593; Hesse v. Knippel, 1 Mich. N. P. 109; Martin v. Courtney, 75 Minn. 255, 77 N. W. 813; Corsi v. Maretzek, 4 E. D. Smith (N. Y.) 1; Williams v. Poppleton, 3 Ore. 139; and Nelson v. Harrington, 72 Wis. 591, 7 Am. St. Rep. 900.

A short review of those cases is both pertinent and interesting.

Force v. Gregory, 63 Conn. 167, was a suit for damages for malpractice in treating plaintiff for ophthalmia. The defendant was a homeopathic physician, and treated the plaintiff according to the system of that school.

There was no question as to the diagnosis of the case. It was simply as to the treatment. The defendant asked the court to instruct the jury, "that treatment by a physician of one particular school is to be tested by the general doctrines of his school, and not by those of other schools." The trial court refused to so instruct, but instead instructed the jury as follows: "In regard to that matter, I will say that the defendant's negligence or want of skill in the treatment of the plaintiff's eye must be determined by all of the evidence in the case, and if the defendant adopted the treatment laid down by one particular school of medicine, and the medical testimony offered by plaintiff related to treatment prescribed by a different school, you will weigh the testimony, having regard to any bias or prejudice that might influence the testimony of those who belonged to a different school from that of the defendant. You should also take into consideration the training and education of the defendant for his profession, the experience which he has had, and the degree of skill with which he handled the case, all bearing upon the question whether the defendant used ordinary care and skill in the treatment of the plaintiff."

The Supreme Court of Connecticut quoted with approval the cases of Patten v. Wiggin, 51 Me. 594, and Bowman v. Woods, 1 Greene (Iowa) 441, and held that the trial court erred in not instructing as the defendant asked and in instructing as it did, and said that "the jury are not to judge by determining which school, in their own view, is the best," and that the bias and prejudice of one school against the other is the very thing that defendant stood in danger of, and that as it appeared that the homeopathic school prescribed certain rules and principles of practice for the guidance of its members, in such cases, and as the defendant belonged to that school, he could only be judged by the doctrines of his school and not by those of other schools,

and accordingly reversed the judgment of the lower court, which was in plaintiff's favor.

Patten v. Wiggin, 51 Me. 594, was a suit for professional services. The defense was malpractice. The report of the case does not show to what school of medicine the plaintiff belonged, or whether physicians of any other school testified, nor what the disease of the defendant was, nor whether the malpractice consisted of an improper diagnosis or an improper treatment. It simply shows that the defendant claimed that the plaintiff was guilty of malpractice "in the treatment, and such ignorance and want of skill and judgment on the part of the plaintiff in managing the case, that the patient was more injured than benefited by his treatment."

The trial court instructed the jury in regard to the general duty and liability of a physician, substantially as hereinbefore quoted from the American and English Encyclopedia of Law, and then added: "If the case is such that no physician of ordinary knowledge or skill would doubt or hesitate, and but one course of treatment would by such professional men. be suggested, then any other course of treatment might be evidence of a want of ordinary knowledge or skill, or care and attention, or exercise of his best judgment, and a physician might be held liable, however high his former reputation. If there are distinct and different schools of practice, as allopathic or old school, homeopathic, Thompsonian, hydropathic, or water cure, and a physician of one of these schools is called in, his treatment is to be tested by the general doctrines of his school, and not by those of other schools. It is to be presumed that both parties so understood it. The jury are not to judge by determining which school, in their own view, is best." The court also instructed the jury, "that in cases where authorities differ, or 'doctors disagree,' the competent physician is only bound

to exercise his best judgment in determining which course is, on the whole, best.''

The Supreme Court said that ''the instructions given were in accordance with well-settled principles of law,'' and affirmed the judgment, in favor of the plaintiff.

Bowman v. Woods, 1 Greene (Iowa) 441, was a suit for damages for malpractice in a case of accouchement, in that, the defendant failed to remove the placenta or relieve the bladder for thirty-six hours after parturition. The plaintiff showed by the testimony of allopathic physicians that such treatment was improper and liable to result in puerperal fever. The defendant then offered to prove that he was a botanical physician, and that according to the botanic system of practice of medicine, it is considered improper to remove the placenta, and that it should be permitted to remain until expelled by the efforts of nature. The trial court excluded the testimony so offered. The Supreme Court held that no particular system of medicine is established or favored by the laws of Iowa, ''and as no system is upheld, none is prohibited;'' that ''the regular, the botanic, the homeopathic, the hydropathic, and other modes of treating diseases, are alike unprohibited,'' and that, ''a person professing to follow one system of medical treatment, can not be expected by his employer to practice any other. . . . Therefore, if in this case, the defendant below could show that he was employed as a botanic physician, and that he performed the accouchement with ordinary skill and care, in accordance with the system he professed to follow, we should regard it as a legal defense.'' Accordingly a judgment in favor of the plaintiff was reversed.

Martin v. Courtney, 75 Minn. 255, was a suit for malpractice against an allopathic physician and surgeon, in the amputation and subsequent treatment of the plaintiff's husband's toes, which had been crushed by accident. A second amputation was found neces-

sary, and the sole point was whether it should have been of an additional quarter of an inch of the foot or of the whole foot at the ankle. Another allopathic physician testified that the defendant had acted properly. But the plaintiff called a homeopathic physician and asked his opinion as to whether the treatment was proper. Upon objection being made to this the witness testified that there is a decided difference between the rules and principles of the two schools as respects "the practice of medicine," but not as respects surgery; that there was no difference between the two schools as to the treatment of sepsis connected with surgery, but there was a difference where the sepsis has produced a diseased condition, for then it became a question of disease and not of surgery, and the treatment of the two schools would be entirely different. The defendant offered to prove that the two schools are hostile to each other in their rules of treatment of sepsis, even in cases connected with surgery. The trial court excluded the evidence offered by the defendant, and permitted the homeopathic physician to testify. The Supreme Court held this to be error, and that a physician must be judged by the rules and principles of medicine of the school to which he belongs and not by those of any other school, and accordingly reversed a judgment in favor of the plaintiff.

Corsi v. Maretzek, 4 E. D. Smith (N. Y.) 1, was a suit by an opera singer against the director of an opera for two weeks' salary. The defense was that the plaintiff failed to appear at an entertainment, and that his contract provided that in such event he should forfeit a month's salary, unless he was prevented by sickness, which had to be proved by a doctor appointed by the director, and that the director had appointed such doctor, but that the plaintiff did not prove his sickness by him. The defendant proved by an allopathic doctor that he was sick, and claimed that the doctor appointed by the director was a homeopath and contended that

a homeopath was no doctor at all.    The plaintiff re-
covered in the lower court, and the defendant appealed
to the court of common pleas of the city and county of
New York.    The decision of the latter court is quite in-
teresting as a review of the origin and development of
the science of medicine, and holds that a homeopath is a
doctor, but the decision does not throw any light upon
the case at bar.

    Williams v. Poppleton, 3 Ore. 139, was a suit for
damages for malpractice in the treatment of plaintiff's
fractured ankle.    The only point in the case which at
all bears on this case is that the court held that, ''if the
treatment is according to a recognized system of sur-
gery, it is not for the court or jury to undertake to de-
termine whether that  system is the best among  the
many that may be adopted by different branches of the
medical profession.    It is sufficient if the practitioner
follow any of the known and recognized systems.''

    Hesse v. Knippel, 1 Mich. N. P. 109, was an action
for damages for malpractice.    It is a charge to the jury
by a *nisi prius* judge, and contains nothing that is per-
tinent to the question here under discussion.

    Nelson v. Harrington, 72 Wis. 591, was a suit for
malpractice.    The defendant was a clairvoyant, and
claimed to diagnose and treat diseases by going into
a trance, and while in that state to receive information
as to the character and proper mode of treating the
disease.    The court held that allopathic physicians were
competent, in such case, to give an opinion as to the
correctness of the diagnosis and treatment.    The decis-
ion also holds, as the rule is hereinbefore stated, that
to constitute a school of medicine it must have rules
and principles of practice for the guidance of all its
members as respects principles, diagnoses, and remed-
ies, which each member is supposed to observe.    That
case is cited and quoted from approvingly by BURGESS,
J., in Longan v. Weltmer, 180 Mo. l. c. 333, to which
reference will hereafter be made.

This is the state of adjudication in other jurisdictions. It is to the credit of the gentlemen of the medical profession in this State, that very few cases of this character have heretofore reached this court. The first case reported is West v. Martin, 31 Mo. 375. It was a suit for damages for malpractice. This court, per Ewing, J., said: "Whether errors of judgment will or will not make a surgeon liable in a given case depends not merely upon the fact that he may be ordinarily skillful as such, but whether he has treated the case skillfully or has exercised in its treatment such reasonable skill and diligence as is ordinarily exercised in his profession. For there may be responsibility where there is no neglect, if the error of judgment be so gross as to be inconsistent with the use of that degree of skill that it is the duty of every surgeon to bring to the treatment of a case according to the standard indicated." That case did not involve the question now under consideration.

Vanhooser v. Berghoff, 90 Mo. 487, was a suit for damages for malpractice in not using proper appliances to hold the limb in place, after a dislocation of the hip had been reduced. Prior to the treatment by the defendant, the plaintiff had been treated by other doctors, of the same school of medicine with the defendant, who had tried to reduce the dislocation by "manipulation," and had failed. The defendant also tried to reduce it by "manipulation" and failed, and then he used pulleys and the Jarvis adjuster to extend the limb so as to permit the head of the femur to "snap" into the socket. There was no question about the diagnosis being correct, nor as to the use of the pulley and Jarvis adjuster, but the whole question was as to whether the defendant used proper appliances to keep it in place. It slipped out of place after the first operation, and a second operation was necessary. There was no question as to the different schools of

medicine, as all the experts belonged to the same school of medicine with the defendant.

Wheeler v. Bowles, 163 Mo. 398, was an action for malpractice in reducing a dislocation of the shoulder. The instructions given stated the general rule as to the duty and liability of physicians and surgeons, which this court quoted and approved. The case did not involve any difference of schools of medicine, as the experts all belonged to the same school with defendant.

Longan v. Weltmer, 180 Mo. 322, was a suit for damages for malpractice. The defendant claimed to be a "magnetic healer," who healed by a power which he alone possessed. He did not belong to any school of medicine. He objected to the competency of physicians of the allopathic school. He treated the plaintiff for some derangement of the stomach, by placing the plaintiff on her back on a padded table, and then put one hand on her stomach, and the other hand under her knees, and bent her so that her knees touched her breast. He then placed her on her stomach on the padded table, and put his left hand on the small of her back over her spine, and his right hand under her knees and bent her legs up until she screamed with pain. This treatment resulted in the ligaments connecting the backbone and hipbone being ruptured and torn, and the back and spine and pelvic organs being permanently injured.

This court quoted approvingly the decision of the Supreme Court of Wisconsin, in Nelson v. Harrington, 75 Wis. 591, and in speaking of the medical expert testimony said: "While it is true that the physicians who testified on the part of the plaintiff did not claim or pretend to known anything about the practice of magnetic healing, they were nevertheless competent from education and experience to testify whether the treatment which plaintiff underwent was proper, in any case, and especially in her condition. Simply because a person claims or pretends to possess certain powers

of healing peculiar to himself, is no reason why other persons who do not claim such powers are not, from education and practice, competent to judge whether the treatment administered was negligently or carelessly done. Otherwise, any non-professional person might undertake to treat a certain disorder, and if defendant's position be correct in law, it would not matter how carelessly or negligently that treatment were performed by such person, for if no one could be found of the same pretensions to testify with respect to such treatment, the injured person would be without remedy. The contention is, we think, untenable.''

From the foregoing it will be seen that while the prior decisions of this court state the general rules as to the liability and duties of physicians and surgeons, substantially as they obtain in other jurisdictions, the precise question here involved has not undergone adjudication by this court. The case is, therefore, one of first impression in this State, and its importance is a sufficient excuse for the length of this opinion.

At the outset of the discussion it is important and essential to note the provisions of the statutes of this State which bear upon the question.

Chapter 128, Revised Statutes 1899, relates to medicine, surgery and dentistry. Article 1 of that chapter (sec. 8507) provides: ''Every person practicing medicine and surgery, in any of their departments, shall possess the qualifications required by this article.'' In brief the qualifications are that the person shall be a graduate of some legally chartered medical institution in good standing, of whatever school of medicine, and the person exhibiting the same shall be licensed to practice by the State Board of Health, which board is prohibited from discriminating against the holders of any diploma or license under any sytem or school of medicine. If not such a graduate, the person must stand an examination before the said board.

Article 4 of said chapter relates to osteopathy.

Section 8537 prescribes that: "The system, method or science of treating diseases of the human body, commonly known as osteopathy, and as taught and practiced by the American School of Osteopathy of Kirksville, Missouri, is hereby declared not to be the practice of medicine and surgery within the meaning of article 1 of this chapter, and not subject to the provisions of said article."

Section 8538 of said article 4 is as follows: "Any person having a diploma regularly issued by the American School of Osteopathy of Kirksville, Missouri, or any other legally chartered and regularly conducted school of osteopathy, who shall have been in personal attendance as a student in such school for at least four terms of not less than five months each before graduation, shall be authorized to treat diseases of the human body according to such system, after having filed such diploma for record with the clerk of the county court of the county in which such person proposes to practice; and having filed with such clerk an affidavit that the diploma is genuine, and that he or she is the person to whom the same was issued, and that all the provisions of the article were fully complied with before the issuing of such diploma; whereupon the clerk shall record such diploma in a book to be provided by him for that purpose, and shall indorse upon such diploma the date of filing and recording same, for which he shall receive from such person a fee of one dollar."

Section 8539 of said article makes it a misdemeanor for any person to practice or use the system, method or science of osteopathy in treating diseases of the human body without having complied with said article. But said section concludes as follows: "Provided, that nothing of this article shall be construed as prohibiting any legally authorized practitioner of medicine or surgery in this State from curing or relieving disease, with or without drugs, or by any manipulation by which any disease may be cured or alleviated."

It will thus be observed that the position of osteopaths in this State is not only anomalous, but that it is *sui generis.* Anomalous, because while it is spoken of as a system, method or science, it is yet declared not to be the practice of medicine and surgery, in any of its departments. And *sui generis,* because osteopaths are not subjected to the jurisdiction of the State Board of Health, as all other practitioners of medicine and surgery, in any of its departments, are. Yet, any legally authorized practitioner of medicine and surgery is expressly permitted to cure or relieve diseases, with or without drugs, or by any manipulation by which any disease may be cured or alleviated.

In other words, osteopaths are not physicians or surgeons, in any of the departments of medicine or surgery, but may cure or relieve any disease of the human body according to the system, method or science as taught by the American School of Osteopathy of Kirksville, Missouri, or any other legally chartered and regularly conducted school of osteopathy.

Neither the statute nor the record in this case shows what such system, method or science is. The plaintiff offered to prove that they use the same text-books as other schools of medicine, and also that they have no fixed rule of practice for the treatment of hip joint disease, and, for the purposes of the case, the trial court ruled that such facts might be considered as proved.

On their face these two things seem to be inconsistent, for if osteopaths teach the same text-books as other schools of medicine and surgery, it can not be true that they have no fixed rule of practice for the treatment of hip disease, because such text-books of other schools of medicine and surgery prescribe rules for the treatment of hip joint disease, as the testimony in this case clearly shows.

If it be true that osteopaths teach the same text-books as other schools of medicine, then there can be

no reason why a physician of any other school is not a competent witness to express an opinion as to the correctness of the diagnosis and treatment of hip disease by an osteopath, because *pro hac vice* the rules and practices of both are the same.

On the other hand, if osteopaths have no fixed rule of practice for the treatment of hip disease which all must adhere to, then they do not constitute a school of medicine and fall in the category spoken of in Nelson v. Harrington, 75 Wis. 591, and Longan v. Weltmer, 180 Mo. 322, and regular practitioners of medicine and surgery are competent witnesses, and it may be safely assumed that osteopaths would not willingly be so classed, nor is it fair to so class them without more satisfactory evidence than is disclosed by this record.

It is said that allopaths are ''antis'' and homeopaths are ''similias,'' but that osteopaths are neither. This may be true, but the terms relate rather to the treatment or remedies employed to cure disease, than to the diagnosis of the disease. The disease is the same no matter which school of medicine the attending physician belongs to. And judging by the examination of the witnesses in this case and the theories upon which both parties tried this case, hip disease is ascribed to the same causes, and the diagnosis of the case is the same, by both osteopaths and physicians and surgeons of every other school of medicine. They may differ as to the proper treatment of the disease after its presence is ascertained, but there is no difference as to diagnosis. And the same is true as to dislocations.

This being so, there is no sound reason why a physician of any school should not be a competent witness to testify whether a patient has hip disease, dislocation, or as to any diagnosis of any disease. The bias or prejudice of one school of medicine against another can not affect the question of the diagnosis, how-

ever much it might affect the treatment employed by the other school.

At least this is the common sense of the matter, and is the only conclusion that is fairly deducible from the testimony in this case and from the theories upon which both parties tried this case, and from the offer of proof made and treated as proved at the close of the plaintiff's case.

It, therefore, follows that the expert medical witnesses offered by the plaintiff were competent to express an opinion as to the diagnosis that was made by the defendant of the plaintiff's trouble, as related by the lay witnesses, to-wit, that she had partial dislocation of the hip joint and did not have hip disease, and also competent to testify as to any scientific fact that is, or ought to be, known to every physician and surgeon of every school or system, but they were not competent to express an opinion as to the treatment of the plaintiff by the defendant, unless it should appear that both the schools to which the witnesses and the defendant belonged employed the same treatment.

This seems the safest rule to adopt in such cases and the one least liable to cause injury or injustice to either party. It must be borne in mind, however, that only the plaintiff's side of this case is before the court, and that the defendant has not shown his side of it, except as his cross-examination of the plaintiff's witnesses indicates it.

For these reasons the judgment of the circuit court is reversed, and the cause remanded to be tried in accordance herewith. All concur.