JESS PEDIGO v. DR. E. C. ROSEBERRY and DR. P. A. HOLMES, Appellants.—102 S. W. (2d) 600.

Division Two, March 11, 1937.

*Frank B. Williams* and *Don C. Wray* for appellants.

726

*George Thornberry* and *Hamlin, Hamlin & Hamlin* for respondent.

BOHLING, C.—Jess Pedigo, respondent, instituted a civil malpractice action against Drs. E. C. Roseberry and P. A. Holmes, appellants, for $40,000 damages. The jury returned a verdict for appellants. Respondent's motion for new trial was sustained and appellants appealed. The case reaches the writer upon reassignment.

Appellants filed the statutory affidavit for appeal, which (omitting matter not material here) stated the appeal was prayed for because affiant "considers defendants aggrieved by the judgment and decision of the court. . . ." The record recited appellants filed their affidavit "praying the court to grant them an appeal from the order sustaining the motion for new trial herein"—an appealable matter under Section 1018, Revised Statutes 1929 (Mo. Stat. Ann., p. 1286). Relying on Pence v. Kansas City Laundry Co., 332 Mo. 930, 936(1-8), 59 S. W. (2d) 633, 635(2-7), respondent contends the affidavit failed to identify the order sustaining respondent's motion for new trial as the matter appealed from and is insufficient to confer jurisdiction. In the Pence case defendant corporation's affidavit prayed for an appeal "because the affiant believes that the appellant is aggrieved by the decision and judgment of the court." The court, in overruling the motion to dismiss, found the affidavit to be in the form prescribed by statute (Sec. 1020, R. S. 1929, Mo. Stat. Ann., p. 1295), and held it sufficient to sustain an order granting an appeal from appealable matters and controlling over an accompanying application praying an appeal from the orders overruling the motion for new trial and in arrest of judgment. The instant affidavit is in the formula prescribed by Section 1020 for appeals allowable under Section 1018. The only ruling adverse to appellants on the case as a whole was the order sustaining the motion for new trial, and respondent could not have been misled. Affidavits following the wording of Section 1020 and seeking the review of an appealable matter mentioned in Section 1018 have been construed according to their spirit and intent. [State ex rel. v. Broaddus, 210 Mo. 1, 16, 108 S. W. 544, 547; cases cited in 2 Houts Mo. Pl. & Pr., sec. 497, n. 18 et seq.]

Kennedy v. Bowling (Banc), 319 Mo. 401, 408, 4 S. W. (2d) 438, 441(1), held an application and affidavit referring to the matter appealed from and by which appellants were aggrieved as the "judgment and decision of the court" sufficient for the review of an order sustaining a motion for new trial. The motion to dismiss is overruled.

The trial court sustained respondent's motion for new trial on the ground of misdirection of the jury in the giving of appellant's instructions 5, 15 and 23. Appellants contend here, first, that the instructions were proper and, second, that error, if any, in the instructions was not prejudicial as respondent failed to make a case for the jury. Preliminary to a statement of the facts, we mention that respondent concedes the operation of September 14th was a success, but contends, as hereinafter set forth, appellants negligently permitted the pressure of the fracture board against his hip to result in unnecessary pain, etc., and a bedpan accident to result in unnecessary pain, etc., and the shortening, etc. of his leg.

On September 9, 1929, respondent was in an automobile accident and suffered a compound comminuted fracture of the right femur about two and one-half inches above the knee joint and a compound comminuted fracture of the right tibia and fibula about two and one-half inches below the knee joint. A compound comminuted fracture is one where the bone is broken in three or more fragments, and where an open wound connects with the line of fracture through the skin and through the soft tissues. Respondent was taken to the office of Dr. Holmes in Mount Vernon. Dr. Holmes recommended that he go to the Baptist Hospital in Springfield and employ Dr. Roseberry, a surgeon for treatment. Respondent arrived at the hospital later that morning. X-rays were taken of the fracture. They disclosed an oblique fracture of the femur, permitting the fragments of bone to slip easily by each other and the necessity of a metal plate to hold the bone fragments in position. Appellants reduced the fracture, endeavored to get the bone fragments in as good alignment as possible and applied immobilizing agents. No operation was performed at that time on account of the danger of infection developing. According to the evidence an infection sometimes develops in twenty-four to forty-eight hours, and usually develops, if at all, in from four to seven days. Appellants informed respondent of the severity of his injury and it was understood they were to try to save his leg. On September 14, appellants operated, placing a "Lane" bone plate around the oblique fracture of the femur, fastening it with five one-half inch screws to the bone, which then was in good condition except for the fracture, and removed three small loose fragments of bone. A "cigarette" drain (a rubber tubing with a strip of gauze through it) was inserted to forestall the development of any infection. A splint was again firmly fastened to respondent's leg for immobilization, and a "Buck's" extension was applied. Respondent testified that after

the operation an eight inch board, with "cotton and other stuff" on it, extending from his heel to the center of his hip, was placed under his leg; that footboards were nailed to this board, forming a box, and the leg taped in the box; that two or three days after the operation his leg began to swell, and the board cut the flesh and commenced to hurt him, and prevented him from resting and sleeping, that he reported this to the nurse twenty-five times more or less, but never made complaint to the doctors except once; that he was not treated for this; that the wound above his knee was discharging pus after the operation and that it continued to discharge pus all the time he was in the hospital and off and on up until the trial; that he judged about ten or twelve days after the operation he had a bedpan accident; that the bedpan in some manner tipped and shot out from under him, letting him fall to the bed; that his leg "popped, jumped and hurt so that it nearly threw me into spasms; my leg jumped and jerked and hurt so badly, that I told the nurse that my leg was hurt badly, that the plate had come off or that I had broken my leg over; I didn't know what had happened;" that he reported this to Dr. Roseberry the next morning but appellants administered no treatment; that during his stay at the hospital Dr. Roseberry called on him about four times and Dr. Holmes twice. Dr. Roseberry was the operating surgeon and resident physician. He testified he saw respondent daily (three times on the 9th) prior to the operation and practically daily thereafter for examination of the gauze, any discoloration of his foot, misalignment of the bone, and the condition of the bandages; that the wound was dressed daily and he personally dressed it a number of times; that they feared a shortening of the leg and the weights were used to overcome muscular contractions which might produce an overlapping of the bone fragments; that infection delays ossification or union of the bone, and even had he discovered a disalignment of the femur, he, at that time, could not have readjusted the fragments on account of the infection for which he was treating respondent; that pus discharged from the drain; that respondent complained of pain in his leg at various places and stated the fracture board was pressing against his hip and paining him; that he (witness) investigated and inserted additional padding at times and instructed the nurses, if respondent complained of pressure about the hip, to change the padding as often as necessary and make it as comfortable as possible; that a physical examination of the hip showed there was nothing wrong with it while respondent was in the hospital; that he explained to respondent the fracture board would have to remain to keep the fragments in place, and not be taken off every time it hurt, if results were to be had. Nurses testified they repadded the fracture board at the hip upon complaint from respondent and that he did not have any bed sores or sore on his hip while in the hospital. Appellants testified they never heard of the

bedpan accident until, after the filing of the lawsuit; and the nurses testified they never heard of it while respondent was in the hospital. Dr. Roseberry testified respondent talked about leaving the hospital after he had been there about three weeks and he told respondent the idea was absurd because the bones could not knit or unite in that time; that after the infection and swelling had subsided sufficiently his leg should be enveloped in a plaster cast or a different splint applied; that the plate would have to be removed after there had been opportunity to get results; that he did not sign any order authorizing respondent's removal from the hospital and respondent left against his consent and advice; and that respondent never communicated with him after leaving the hospital. Respondent left the hospital on October 10th, went to his mother's, nineteen miles distant, in an ambulance, where he was transferred to a bed. Dr. Holmes was called and removed the splint or box on October 12, respondent informing him Dr. Roseberry had authorized the removal of the fracture board, which Dr. Roseberry denied. Dr. Roseberry testified that on the day before respondent left the hospital and Dr. Holmes testified that on the day he removed the splint respondent's legs were of equal length. At the time of trial it was conceded respondent's injured leg was three inches shorter than the other. After eight days, respondent was carried on a canvas cot to his home, a distance of a mile and a half. He was transferred from the cot to a bed within about a week. He used a pad when evacuating for about a month or so, but after that he got up and used a chair. Respondent testified in chief he began using crutches, which were short for him, between Christmas and New Years but, when called in rebuttal, placed the time as the last of January or the first of February. Respondent changed his residence February 3rd. Respondent's wife testified respondent took two automobile trips in December, she thought prior to Christmas; that he began to get around out of doors on his crutches the last of February, and walked about a quarter of a mile to a neighbors. There was testimony from other witnesses that when they visited respondent at his home in October and November, 1929, he would be in bed or sitting on the side of the bed or in a chair, and that on Thanksgiving afternoon respondent, with the aid of crutches and supported on either side, walked from his bed to the front porch and entered an automobile to go to his mother's.

Respondent offered Drs. W. T. Walsh, one of the medical board appointed by the court, R. W. Smart, J. H. Young, and C. W. Russell and appellants offered appellant Roseberry and Drs. M. L. Klinefelter, Rex. L. Dively, and F. T. H'Doubler as expert witnesses on the issue of negligence *vel non*. X-ray films, taken in November, 1930, and January, 1931, by Dr. Smart, were submitted for interpretation. They disclosed the screws, or some of them, of the Lane bone plate had given way; the plate had loosened, and fragments of the femur (at the

lower end of the fracture) had overlapped. Dr. Smart testified the plate was not holding anything, while Dr. Dively testified the three screws holding the upper fragment (which appeared firm) showed solid and proper, and a bending of the bone had carried the lower end of the plate with it. The experts agreed they could not state from the X-rays when the condition shown first came into existence. Respondent's experts testified, corroborated on certain particulars to some extent by some of appellant's experts, to the effect, among qualified and skillful physicians and surgeons in similar localities, it was not proper to fail to examine or release the bandages, or examine, treat and attend to respondent's hip upon his complaint of pain thereat (a rather common complaint connected with such injuries) from pressure of the fracture board; and to fail to make an examination and treat and attend respondent upon receipt of his complaint concerning the bedpan accident; that the physician should investigate, make a thorough investigation, and examine the leg to ascertain if it was in line and as long as the other; and that an X-ray would have shown a misalignment but not necessarily the loosening of the screws. The testimony of the experts, interrogated on the subjects, was to the effect they had never heard of a fall from a bedpan ten or twelve days after an operation on a healthy femur dislodging the screws of a Lane bone plate and refracturing a femur and that, in their opinion, the fall had not produced the results shown in the X-rays. Some testified the bone could not have softened around the screws in that time and the bone plate would have fractured before the screws loosened. An operation is necessary to correct the deformity of respondent's femur. There was ample evidence warranting a finding the femur wound showed an infection at the time of the bedpan accident. Experts testifying on the subject were of the opinion that it would have been "improper," "ill-advised" or "very dangerous" to operate with an infection present, and that the proper practice was first to eliminate the infection. Others testified that any corrective maneuvers were not safe, and that an X-ray would necessitate the removal of the fracture board, the preparing and moving of respondent and would have been reckless. There was testimony that an infection usually delays bony union or ossification and causes a sloughing of tissues; that, considering the upper screws showed rather firmly held and the infection would have to spread to the location of the screws and exist long enough to soften the bone, several weeks would elapse before the screws would loosen on account of the infection; that it was extremely doubtful if any bony union existed at the time the fracture board was removed; that the condition of respondent's leg shown by the X-rays could be attributed to muscular contraction or respondent's activity and use of the leg subsequent to the removal of the immobilizing agents or to the infection. The estimates of the time necessary for bony union varied, the femur being a large weight-carrying bone

and healing more slowly than others, and was placed by some at periods between four and twelve months or longer.

Reading respondent's instructions P-1 and P-2, respondent predicated an award, first, on pain suffered near his hip occasioned by alleged negligence of appellants in failing to remove the splint or fracture board, or, second, on the lamed, crippled and deformed condition of his leg occasioned by alleged negligence of appellants in failing to treat respondent's fractured femur after the bedpan accident.

Respondent's brief under his "points and authorities" reads: "II. Instruction number five singles out and comments on the opinion testimony of the expert witnesses, thereby usurping the functions of the jury. The same vice is apparent in instruction twenty-three, with the additional fact that the last paragraph of that instruction directs the jury not to consider the opinions of laymen but to consider the opinions of the medical surgical experts only." The three cases first hereinafter discussed are cited in support of the contention. The point is not further developed.

A discussion of the issues within the general objections thus lodged against appellant's instructions D-5 and D-23 does not call for the insertion of a copy of said instructions or a discussion of their different paragraphs, sentences, clauses, phrases, etc., herein. Interpreting the instructions in the light of the evidence: Instruction D-5 told the jury that nonexpert witnesses could testify concerning external appearances and manifest conditions observable by every one; that, however, the issues of fact as to whether or not the surgical operation had been performed with due skill, care, etc., and whether or not respondent was thereafter accorded due treatment were questions of science, to be established by the testimony of witnesses of special skill and experience and not by the testimony of witnesses without special learning and skill; and that the jury should be guided by the testimony of the experts where they agreed upon any essential fact, but where they disagreed, it should determine the truth from all the evidence in the case. Instruction D-23 required the *submitted issue* of negligence *vel non* subsequent to the bedpan accident to be determined from the medical testimony; and concluded with the following paragraph: "The question here is one of medical and surgical skill, and is not to be determined except by the opinion of medical and surgical experts, and you will not consider the opinions of laymen in this connection."

In Scanlon v. Kansas City, 325 Mo. 125, 148 et seq., 28 S. W. (2d) 85, 95, 96(13-17), a fact issue developed as to whether the paralysis involved was the result of infantile paralysis or a fall on a defective sidewalk. Defendant contended plaintiff's Instruction No. 2P commented upon the "opinion" testimony of physicians. The instruction told the jury among other things: ". . . but the court instructs

you that the testimony of all the experts on both sides of the case, as to the cause of said condition is merely advisory in character and not binding on the jury. . . ." The case held "an opinion, when . . . an inference drawn by one of requisite experiential capacity from adequate data, *is evidence*," of equal value with "so-called fact testimony;" and that the instruction in disparaging and singling out "for comment the opinion testimony" was "a plain usurpation of the functions of the jury," and was manifestly prejudicial to defendant, who had no fact but only expert testimony upon the issue, in plainly instructing the jury "that the opinion testimony was not evidence in the same sense that the other testimony was; that it was mere advice which they were at liberty to disregard;" because the testimony showed an "apparently active, healthy child fell upon a sidewalk; that immediately following the fall he did not stand and did not thereafter use his legs; and that within about three days after the fall paralysis of the lower part of the body set up and became permanent. From these facts alone a jury would be inclined to infer that the fall caused the paralysis, although they would not have the requisite experiential capacity to draw such an inference."

Conduitt v. Trenton G. & E. Co., 326 Mo. 133, 144(4), 31 S. W. (2d) 21, 27(11, 12), followed the Scanlon case. Speaking of that part of the instruction reading: "The jury is not bound by expert testimony," the court said: "One of the hotly contested issues of fact was whether the paralysis and cancer from which the respondent suffered were due to the electric shock or to certain pre-existing physical and nervous ailments. Obviously, on these questions, the seasoned opinion of medical experts must be controlling. It was, as said in the Scanlon case, substantial evidence, indeed, practically the only evidence available. This being true, to tell the jury they were *not bound* by this testimony but *may* (and therefore may not) consider it, was to strike at some of the most important evidence in the case."

Zeikle v. St. Paul & K. C. S. L. Railroad Co. (Mo. App.), 71 S. W. (2d) 154, 156(5), followed the Scanlon and Conduitt cases. Plaintiff's instruction told the jury ". . . the opinions of the witnesses as experts are merely advisory, and not binding on the jury." The court said [l. c. 157]: "It can hardly be said that a jury can arrive at the carrying capacity of a stream [the subject-matter of the expert testimony], as well as can experts. When a fair degree of exactness be required, or desired, such a matter, largely, is necessarily a subject of measurements and opinions of experts as to the capacity of the stream based upon such measurements."

Among other cases to like effect are: Phares v. Century Electric Co., 336 Mo. 961, 967(3), 82 S. W. (2d) 91, 94(7-12); Davis v. Independence, 330 Mo. 201, 214(IV), 49 S. W. (2d) 95, 100(11), 101; McDonough v. Freund (Mo. App.), 39 S. W. (2d), 818, 820(3).

If these cases ruled the instant issue it would need but passing note. They condemn the instructions because their apparent purpose was the destruction, minimizing or belittling of expert testimony. Such vice does not exist in the instant instructions. They expressly required the jury to give consideration to the testimony of the expert witnesses. The issue presented appears to be one of first impression.

Whatever the subject of inquiry, only qualified witnesses may testify; and to the extent he must know whereof he speaks (possess testimonial qualifications), every witness is an expert. Ordinarily, litigation relates to subjects within the experience and knowledge common to mankind in general. On such subjects a jury of laymen, possessed of the facts, is as competent as the witness to draw conclusions, and opinion testimony is excluded because superfluous. Lay witnesses, possessing the necessary experience, may state their opinions when derived from observation, for want of better evidence, on certain subjects; for instance, time, quantity, dimensions, speed and the like. Other subjects of litigation may embrace as one or more elements of a main determinable fact issue a subject or topic whereon the opinion of one possessing special qualifications will aid the jury in its conclusions; and the opinion of such a qualified witness is admissible as an aid to the jury. There are, however, subjects of litigation, though comparatively few, involving a main ultimate fact issue not within, but beyond, the general experience and common knowledge of mankind, for the determination of which "scientific" experience is indispensable and the necessary testimonial qualifications may be acquired only through the systematic and thorough study of, training in, and application of knowledge to the science or art involved. The logic of such a situation (more forcibly than the logic which excludes opinion testimony where jurors possess the necessary experiential capacity) requires the establishment of the ultimate fact through the testimony of those possessing the necessary testimonial qualifications to observe accurately, reason correctly and report truly thereon.

Attend the instant case. It was tried on the theory the issue of negligence *vel non* revolved around the degree of care and skill ordinarily possessed and exercised by physicians and surgeons in good standing in Springfield and similar localities [see Reed v. Laughlin, 332 Mo. 424, 430(2), 58 S. W. (2d) 440, 442(2), and cases cited; Pate v. Dumbauld, 298 Mo. 435, 446 (2), 250 S. W. 49, 52 (2, 3) ; Grainger v. Still, 187 Mo. 197, 213, 85 S. W. 1114, 1119, 70 L. R. A. 49] in the treatment of a human leg for a compound comminuted oblique fracture of the femur and a compound comminuted fracture of the tibia and fibula under all the attending facts and circumstances detailed in evidence. One of the functions of the knee is the greater freedom of motion of the leg and motion of the leg is, in part, the result of the action of the muscles on the bones of the leg. With the bones of the

leg fractured a short distance above and below the knee the contraction of the muscles would not be toward the alignment of the bone fragments. Respondent founds no claim on the existence of infection, which, we understand, may occur irrespective of the skill and care exercised in treating an injury of the nature of respondent's. Respondent's injuries presented nonvisible internal physical conditions, and the physicians and surgeons testifying in the case as experts not only relied upon the history of the case, their observation and examination of his condition, but based their testimony largely on his condition as disclosed by the X-rays. Laymen may readily understand the need of stabilizing supports to maintain the proper alignment of a stick broken into three fragments, one of the breaks being oblique, if force be exerted against either fragment. The problem presented to appellants, however, must have been somewhat unusual, complicated, technical and difficult even for those versed in the science and art of medicine and surgery, for two practicing physicians who were witnesses did not testify as ''experts'' on the ultimate fact. The litigants treated the issue as one not within the experience and knowledge common to mankind. So, under all the facts and circumstances of record in the instant case, whether or not, on one of the issues, a fracture board paining respondent at his hip should have been removed to relieve the pain within a few days after the performance of the admittedly successful surgical operation at the possible sacrifice of the successful results theretofore secured and the risk of further complications; or whether or not, on the other issue, respondent's fall from a bedpan to a mattress ten or twelve days after the operation loosened the Lane bone plate and refractured his femur or disaligned its fragments and the deformed condition of said leg as disclosed by X-rays taken more than a year thereafter was the result of said fall and subsequent improper medical and surgical treatment and attention or the removal of immobilization agents and the pull of the muscles against the bone fragments or the premature activity and use of the leg by respondent were, we think, matters to be determined from the testimony of witnesses possessing the necessary experiential qualifications acquired through study, training and experience on the subject-matter and not from the testimony of the ordinary layman. Our General Assembly exacts of the practitioners of medicine and surgery a certain standard of knowledge, training proficiency for the protection of the sick and afflicted. [See, for instance, Chap. 53, Art. 1, R. S. 1929, Mo. Stat. Ann., p. 5074.] Malpractice cases exist wherein expert testimony is not indispensable to the establishment of negligence. [See, for instance, Hill v. Jackson, 220 Mo. App. 1302, 1306, 290 S. W. 1012(2).] Under the facts and submitted issues, this is not such a case.

The situation presented by the facts and submitted issues in the instant case justified proper instructions on the weight to be ac-

corded the testimony of the qualified experts on the scientific fact issues involved. Among the cases from other jurisdictions embodying pronouncements of law or approving instructions in accord with said instructions D-5 and D-15 are: Sly v. Powell, 87 Kan. 142, 148, 123 Pac. 881, 883, quoted and followed in Paulich v. Nipple, 104 Kan. 801, 806, 180 Pac. 771, 773; Norkett v. Martin, 63 Colo. 220, 165 Pac. 356; McGraw v. Kerr, 23 Colo. App. 163, 171, 128 Pac. 870, 874(10, 11); Stacy v. Williams, 253 Ky. 353, 368, 69 S. W. (2d) 697, 705(10); Spaulding\ v. Bliss, 83 Mich. 311, 315, 47 N. W. 210, 211; Farrell v. Haze, 157 Mich. 374, 379, 122 N. W. 197, 199; Spensley v. Lancashire Ins. Co., 62 Wis. 443, 449, 453, 22 N. W. 740, 743, 744. Additional authorities may be found in 4 Wigmore on Evidence (2 Ed.), section 2090; 48 C. J., p. 1150, note 37 et seq.; p. 1154, notes 88, 89; 22 C. J., p. 731, note 79.

Of Missouri cases: Note the observations in the Scanlon case, supra, with reference to the "experiential capacity" of the jury; in the Conduitt case with reference to the "controlling" and binding effect of "the seasoned opinion of medical experts;" in the Zeikle case, supra, with reference to the ability of a jury to "arrive at the carrying capacity of a stream;" in Cox v. Missouri-K.-T. Ry. Co., 335 Mo. 1226, 1235, 76 S. W. (2d) 411, 414(4), with reference to the necessity for determining the cause of cancer "only from the medical evidence;" Gottschall v. Geiger, 207 Mo. App. 89, 111, 231 S. W. 87, 95(5) (citing a number of cases herein discussed) with reference to the testimonial qualifications of those from whose testimony the question whether or not an abdominal operation was called for was to be determined; the dissenting opinion in Keehn v. D. R. F. Realty Co. (Banc), 328 Mo. 1031, 1043, 43 S. W. (2d) 416, 421, with reference to the requisite experiential capacity of witnesses on the permanency of a nonvisible or intangible physical injury, and not in conflict with the majority opinion on the issue; and in Kerwin v. Friedman, 127 Mo. App. 519, 522, 105 S. W. 1102, 1104, the discussion on the effect of expert testimony on the value of land located in another state, remanding the cause because the jury's finding went beyond such testimony.

If laymen are not to be guided on issues requiring peculiar and thorough special training in a science or art beyond the experience and knowledge common to mankind by witnesses possessing the necessary testimonial qualifications, juries will be cast into a river of doubt and must establish an arbitrary standard of their own founded upon conjecture and surmise in their effort to reach certain and sure ground. Juries should not be thus turned loose and privileged to say, perchance, the method of treating an injury of the nature here involved was negligent notwithstanding, for instance, the uncontradicted competent testimony establish that the uniformly adopted practice of the most skillful surgeons had been followed. Notwithstand-

ing the prerogative of practicing lawyers, the general public, no doubt, considers the members of the judiciary competent to observe accurately, reason correctly and report truly on intricate and involved legal issues, but would not place such confidence in their testimonial qualifications on an issue involving the intricacies of, for instance, television, Einstein's theory of relativity, etc. Nor should a jury of laymen be permitted to establish by laical conjecture and surmise the degree of care and skill exacted of a practicing lawyer in the handling of intricate and involved legal issues. On litigated legal issues both litigants cannot prevail. Upon such subjects experience teaches us that reliance must be placed in those qualified and skilled in the science or art involved.

Only expert witnesses, and no lay witness, testified in the instant case on the subject-matter of the instructions. The nearest approach of any lay testimony on any such issue was respondent's admission he did *not know* what happened to his leg at the time of the bedpan accident. The instructions, therefore, embraced not only all the competent testimony, but all the testimony, in the case bearing upon the issue instructed upon. This, as well as the observations heretofore .made, disposes of respondent's complaint against the last paragraph of Instruction D-23. There were no opinions of laymen for the jury's consideration.

While we need not go to the extent of the rulings made in the cases cited and commend appellant's instructions as models, we hold, under the facts and submitted issues of the instant case, they are not subject to the assignment, lodged against the respective instructions as a whole, that they single out and comment on the opinion testimony of expert witnesses, thereby usurping the functions of the jury.

We are, after investigation, of opinion the giving of Instruction D-15, under the facts and submitted issues of the instant case, was not reversible error within the attack made against it in respondent's motion for new trial. Respondent, after more mature deliberation, must have reached the same conclusion, for his brief nowhere mentions said instruction.

The mere fact that injury follows negligence does not necessarily create liability. The burden of establishing by substantial evidence appellants' negligence as charged and the necessary causal connection between such negligence and the injury alleged rested upon respondent. And, if the evidence merely established that the injury might have resulted from several causes for some but not all of which appellants were liable, the necessary causal connection remained in the realm of conjecture and speculation and respondent's case failed [State ex rel. v. Haid, 325 Mo. 107, 118(2), 28 S. W. (2d) 97, 102(5), and cases cited; Nevinger v. Haun, 197 Mo. App. 416, 428, 196 S. W. 39, 42(5); Mitchell v. Poole, 229 Mo. App. 1, 15, 68 S. W. (2d) 833,

839(6); see, also, Grindstaff v. J. Goldberg, etc., Co., 328 Mo. 72, 79, 80, 40 S. W. (2d) 702, 705(6, 8)].

We find no evidence of record from which it might be inferred that proper treatment called for the removal of the fracture board to relieve the pain at respondent's hip. And, aside from other possible reasons, all that the evidence disclosed with reference to the cause of the crippled condition of respondent's leg was that it might have resulted from one or more of several causes; and that it was caused by any negligence of appellants was not removed from the realm of conjecture and surmise. Therefore, under the facts and submitted issues, the verdict was for the right party, and, irrespective of our rulings on the instructions, no occasion exists for concerning ourselves with issues in the case when appellants offered their separate general demurrers.

The motion to dismiss is overruled, and the order and judgment of the trial court, sustaining a new trial, is reversed, and the cause remanded with directions to reinstate the verdict of the jury and enter judgment thereon. *Cooley* and *Westhues, CC.*, concur.

PER CURIAM:—The foregoing opinion by BOHLING, C., is adopted as the opinion of the court. All the judges concur.