## STATE, Use of MILES *v.* BRAININ, M. D.

[No. 100, September Term, 1960.]

*Decided January 17, 1961.*

The cause was argued before BRUNE, C. J., and HENDERSON, HAMMOND, PRESCOTT and HORNEY, JJ.

*James E. Hogan,* with whom was *Arthur J. Hilland* on the brief, for appellants.

*Arthur V. Butler,* with whom were *Welch, Daily & Welch, J. Harry Welch, H. Mason Welch* and *J. Joseph Barse* on the brief, for appellee.

HORNEY, J., delivered the opinion of the Court.

Claiming error in rulings on the admissibility of evidence in a wrongful death action for alleged malpractice, the equitable plaintiffs below (William M. Miles, et al., the husband and children of Lucy M. Miles, deceased, the appellants here) appealed from the direction by the trial court of a verdict in favor of the defendant (William E. Brainin, M.D., the appellee).

The action was based on the following circumstances:

In April of 1956, the deceased, a woman in her late fifties, after having previously enjoyed excellent health, began losing weight and developed excessive thirst accompanied by excessive urination. On May 31, 1956, she suffered a severe attack of the illness and was rushed to the office of the defendant. The doc-

tor, who ordered the patient to bed and visited her at home on the two following days, concluded that the patient apparently had had a virus infection. She recovered and remained comparatively well until December of 1956 when she was again stricken. Dr. Brainin treated her again and reached the same diagnosis as before. Thereafter, in February and March of 1957, the patient suffered similar attacks, the latter of which caused the doctor to order her to a hospital, where she died on March 7, of what was described in the death certificate as "diabetic coma and viral enteritis." No autopsy was performed apparently because of family opposition.

The suit was filed on the theory that Dr. Brainin was negligent in failing to diagnose the disease as diabetes until it was too late to alleviate it by the administration of insulin injections. The defense was that the attending physician did not know, and had no reason to know, the true nature of the disease until less than twenty-four hours before death, and that when he did discover the diabetic condition, he immediately prescribed insulin in a vain attempt to save the life of the patient. Dr. Brainin denied that he had ever been informed of the symptoms of weight loss and excessive thirst and urination; a denial the plaintiffs sought to contradict with evidence, excluded below, to the effect that both the husband and a daughter were present when the patient told the doctor of the symptoms which the plaintiffs say are generally recognized as indicative of diabetes in a woman of the age of the deceased.

The bases for the several assignments of error will be stated as each claim is hereinafter considered.

(i)

The first assignment of error involves a construction of Code (1957), Art. 35, § 9, which in pertinent part provides: "[A]ny party may call as a witness any adverse party * * * and interrogate him by leading questions and contradict and impeach him in all respects as if he had been called by the adverse party."

Dr. Brainin, who was called as an adverse witness by the plaintiffs pursuant to the statute, was asked what were the usual symptoms of diabetes. When an objection on his part

was overruled, the defendant testified that the symptoms were excessive thirst, excessive urination and loss of weight. Following the answer, counsel for the defendant requested, and was granted, a conference with the court. As a result the trial court reversed its prior ruling, ordered the answer stricken and limited the scope of examination to factual questions. Objections to all succeeding questions seeking to elicit the expert knowledge of the defendant as to the issues involved were likewise sustained. The effect of these rulings was to hold that § 9 does not allow an examining party to elicit any *expert* testimony from an adverse witness.

On the problem presented, there is a dearth of authority elsewhere and there is none directly on point in Maryland. Moreover, there are divergent opinions on the question in malpractice cases. In some jurisdictions, when a defendant doctor is called by the plaintiff as an adverse witness for cross-examination, he may be used as a medical expert. In other jurisdictions, the plaintiff is limited to eliciting facts and the doctor may not be required to give an expert opinion. See 98 C.J.S., *Witnesses,* § 367. In 4 Jones, *Evidence,* § 927, the author states positively that the adverse party may not be subjected to an examination as an expert witness, citing *Hunder v. Rindlaub,* 237 N. W. 915 (N. D. 1931), a case characterized in 3 Wigmore, *Evidence* (3rd ed.), § 916, as being "unsound."

A careful examination of the cases in other jurisdictions, and the several statutes construed by the courts in deciding them, leads us to the conclusion that the ruling of the lower court was erroneous. The defendant cites cases [1] from at least four jurisdictions holding—under the particular "adverse witness" statutes there involved—that an adverse party may be examined as if he were under cross-examination, but may not be requested to express an opinion based on his expert knowledge. However, the local statutes under consideration in the cases referred to were, without exception, much nar-

---

1. *Forthofer v. Arnold,* 21 N. E. 2d 869 (Ohio App. 1938); *Osborn v. Carey,* 132 P. 967 (Idaho 1913); *Hull v. Plume,* 37 A. 2d 53 (N. J. L. 1944); and *Hunder v. Rindlaub, supra,* noted with approval in 5 So. Cal. L. Rev. 448 (1932).

rower in scope than the statute (§ 9 of Art. 35) in this State,[2] and we decline to follow the reasons adduced for the conclusions reached in these decisions.

On the contrary, in *Lawless v. Calaway,* 147 P. 2d 604 (Cal. 1949), the Supreme Court of California, in a well reasoned opinion, held that under the terms of the California statute (which is likewise similar to those in Ohio, Idaho and New Jersey referred to in the second footnote) a party could be examined to the extent of the knowledge he actually possessed. The Court said at p. 609:

> "Neither the letter nor the spirit of the statute [§ 2055 of the California Code of Civil Procedure] suggests any reason why the defendant in such an action [a malpractice suit] should not be examined with regard to the standard of skill and care ordinarily exercised * * * under like circumstances and with respect to whether his conduct conformed thereto. We are of the opinion that such examination should be permitted under * * * [the statute] even though it calls for expert testimony."

We think the reasoning in the *Lawless* case is persuasive. The obvious purpose of "adverse witness" statutes is to permit the production in each case of all pertinent and relevant evidence that is available from the parties to the action. Furthermore, it seems plain that the statute in this State is broad enough to encompass whatever expert knowledge the party called as an adverse witness may possess. That this is the case is further buttressed by the striking similarity between

---

2. For example, the Ohio statute (now Page's Ohio Revised Code, § 2317.07) involved in the *Forthofer* case provided that "[a]t the instance of the adverse party, a party may be examined as under cross-examination * * * like any other witness." The Idaho statute (2 Idaho Code, § 9-1206) under construction in the *Osborn* case is substantially the same, as is R.S. 2:97-12, N.J.S.A., passed upon in the *Hull* case. All of these statutes use general language to the effect that the examination shall be in the nature of *cross-examination,* while the Maryland statute, omitting any reference to cross-examination, uses instead the terms "interrogate * * * contradict and impeach."

the provisions of our statute and Rule 43 (b) of the Federal Rules of Civil Procedure. Under that rule, in cases involving pretrial depositions, the federal cases require the deponent to answer questions involving expert testimony. See *Russo v. Merck & Co.,* 21 F.R.D. 237 (D. C. R. I. 1957) and *Broadway & Ninety-Sixth St. Realty Co. v. Loew's, Inc.,* 21 F.R.D. 347 (S. D. N. Y. 1958).

We conclude that the questions asked of Dr. Brainin by the plaintiffs were proper even though an answer would involve the expertise of the witness. A contrary holding would only tend to introduce another artificial distinction in the evidentiary rules of this State that should not be countenanced.

(ii)

When the trial court refused to allow Dr. Brainin to answer any question framed to elicit such expert knowledge as he had, the plaintiffs were without a medical expert to establish the fact that the symptoms displayed by the deceased were those of a diabetic. While the record is clear that the plaintiffs intended to rely only on Dr. Brainin's own testimony to furnish the requisite evidence, it is equally certain that they had no intention of foreclosing their right to call another medical expert should it become necessary. Consequently, when the ruling of the court made the defendant's expertise unavailable to them, the plaintiffs promptly procured Dr. Belden R. Reap to give the necessary medical testimony. But when he was called, the defendant objected to his use as an expert on two grounds. First, because the plaintiffs before trial had stated that they intended to use only the testimony of the defendant, and, second, because the plaintiffs had failed to answer all of the interrogatories submitted by the defendant. The court, in ruling that the plaintiffs had lost their opportunity to call another medical expert, sustained the objection on the first ground suggested by the defendant. The second ground was clearly tenuous and the first likewise lacked substance as the colloquy between counsel for both parties and the court clearly demonstrated. An analysis of the colloquy makes it fairly certain that the plaintiffs never intended to completely foreclose their right to produce other expert medical testimony

than that of the defendant. In response to a question from the bench earlier in the trial as to whether the plaintiffs were going to call other medical witnesses—even though pressed by defense counsel to make an immediate decision and the thought of the court that a straightforward answer ought to be given forthwith—counsel for the plaintiffs consistently maintained that whether he would call another medical expert would "depend on how the case developed" and what he could do "about other testimony." He did not want to foreclose his clients "from that opportunity." At that time he did not think it would "be necessary, but it [might] become necessary"; his clients had "not consulted any medical expert"; and they did not "intend to, but the need of it might arise."

We think it is evident that the pretrial tactics of counsel for the plaintiffs were not so improper as to warrant a forfeiture of the right to call another medical expert. Moreover, when the colloquy took place at the trial, we think it is clear that counsel not only did not surrender that right, but, on the contrary, preserved it by a sufficient reservation, which we believe should have been honored by the court. In addition to this, when Dr. Reap was called, the plaintiffs signified a willingness to agree to a temporary stay of the trial in order to allow counsel time enough to prepare to cross-examine the witness.

We know of no rule preventing a party from calling another witness when the witness originally relied on was precluded from testifying through no fault of the party calling him. Certainly in this instance there was no reason for the plaintiffs to anticipate what the ruling would be with respect to the extent of the examination when the allowable extent of such examination was a question of first impression in this State. Since the plaintiffs were left in the position of having no testimony at all to show that the deceased was in fact a diabetic, it was clearly prejudicial to the plaintiffs' case to exclude Dr. Reap as a witness. He should have been allowed to testify under conditions prescribed by the trial court to insure fairness to both sides of the controversy.

(iii)

The plaintiffs further contend that it was also error for the

trial court to refuse permission to the husband and a daughter of the deceased to testify on the ground that they were precluded under § 3 of Art. 35, commonly known as the "dead man's statute." This section provides in pertinent part:

> "In actions * * * by or against executors, administrators, heirs, devisees, legatees or distributees of a decedent as such, in which judgments * * * may be rendered for or against them, * * * no party to the cause shall be allowed to testify as to any transaction had with, or statement made by the testator, intestate ancestor or party so incompetent to testify, * * * unless called to testify by the opposite party."

The lower court ruled that the equitable plaintiffs were "distributees" within the meaning of the statute. Thus, the question squarely put is whether § 3 precludes an equitable plaintiff from testifying as to conversations which he or she heard between the deceased and the defendant in a wrongful death action. We think not.

While there are decisions of other courts—based on the statute in the state in which the question arose—which hold both ways (see 97 C.J.S., *Witnesses,* § 140, and 16 Am. Jur., *Death,* § 344), we think that the construction of the Maryland statute in *Riley v. Lukens Dredging & Contracting Corp.,* 4 F. Supp. 144 (D. C. Md. 1933), is correct. In that case, for the wrongful death of a daughter, the mother of the deceased sued as an *administratrix ad prosequendum.* After the plaintiff had secured a judgment, the defendant moved for a new trial on the ground that what is now § 3 (of Art. 35) precluded the plaintiff from testifying to the effect that she had been supported by the deceased prior to her death. In overruling the motion, Judge Chesnut stated at p. 146:

> "[T]he statute [Art. 35, § 3] when properly construed does not exclude the testimony of the plaintiff in this particular case. The reasons for the conclusions reached may be briefly stated as follows: (1) The statute was not intended to apply to a situation of this character; (2) the administratrix ad

prosequendum under the New Jersey statute[3] is not a general administrator or executor, and is * * * not to be considered an administratrix at all within the meaning of section 3; (3) the particular testimony admitted did not constitute a 'transaction had with * * * the testator, intestate ancestor or party so incompetent to testify,' within the meaning of the statute as applied in this case."

After summarizing the history of the statute, Judge Chesnut concluded[4] (at p. 147) that the testimony meant to be excluded by the operation of the statute is "that testimony of a party to a cause which would tend to increase or diminish the estate of a decedent by establishing or defeating a cause of action by or against the estate."

Inasmuch as Code (1957), Art. 67 (Negligence Causing Death), § 4, specifically provides that "[e]very such action shall be brought by and in the name of the State of Maryland for the use of the person or persons entitled to damages," it is clear that the equitable plaintiffs did not bring this action as "distributees of a decedent as such." Moreover, it is apparent that it is they who are "entitled to damages" and not the estate of the deceased that would be the beneficiaries in a successful action under the provisions of Art. 67, *supra*. Cf. *Allers v. Leitch*, 213 Md. 390, 131 A. 2d 458 (1957). Since we agree with the decision in the *Riley* case, *supra*, we conclude

---

3. The accident which gave rise to the wrongful death action occurred in New Jersey, but suit was brought in the District Court for the District of Maryland under the diversity of citizenship rule. When the case was tried the substantive law of New Jersey (which is "substantially equivalent" to the Maryland law) was applied under the Maryland evidence rules (specifically what is now § 3 of Art. 35).

4. The conclusion reached in the Riley case was based on the decisions of this Court in *Smith v. Humphreys*, 104 Md. 285, 65 Atl. 57 (1906); *Temple v. Bradley*, 119 Md. 602, 87 Atl. 394 (1913); *Grove v. Funk*, 131 Md. 694, 104 Atl. 368 (1918); *Farmer v. Farmer*, 137 Md. 69, 111 Atl. 464 (1920); *Griffith v. Benzinger*, 144 Md. 575, 125 Atl. 512 (1924); *Schaefer v. Spear*, 148 Md. 620, 129 Atl. 898 (1925); and *Whitehurst v. Whitehurst*, 156 Md. 610, 145 Atl. 204 (1929).

that the equitable plaintiffs in the case at bar are within neither the literal language nor the substantial import of § 3 of Art. 35. For this reason, the husband and daughter should have been allowed to testify as to the conversations which they heard between the deceased and the defendant.

### (iv) and (v)

The last two assignments of error, involving as they do the admissibility of the hospital records, may be considered together. The record shows that at least two resident physicians were in attendance at the last illness of the deceased, and, in the normal course of hospital procedure, wrote certain "progress notes" from time to time relating to the condition of the patient on forms provided by the hospital for that purpose. Furthermore, Dr. Brainin—also apparently pursuant to standard procedure—reviewed the entire hospital record of his patient, including the progress notes, after she had died and endorsed on the record a notation that it had been "examined and approved." Some of the progress notes were actually made by Dr. Abondo, who was not working directly under the supervision of the defendant, and some were made by Dr. Gaerlain, a woman doctor, who was acting under the direction of Dr. Brainin and of whom he testified that "[s]he wrote many of these things [progress notes] at my order." The plaintiffs sought to introduce the progress notes on either of two theories: (1) that the unqualified approval of the notes by the defendant constituted an adoptive admission; and (2) that the resident physicians were the agents of the defendant for the purpose of making the notes. The lower court sustained the defendant's objection "as to such portions of the hospital records as were made by nurses, interns, pathologists or other hospital employees who have not been called as witnesses and the opportunity to cross-examine afforded." In effect, the ruling allowed only the admission of the page containing Dr. Brainin's endorsement, which absent the progress notes, had little, if any, value as evidence.

It is certain that the progress notes made by Dr. Gaerlain were and should have been admitted as evidence since by the defendant's judicial admission she was his agent for the pur-

pose of making such entries as he ordered her to make. See 2 Jones, *Evidence,* § 334. Cf. A. L. I., *Model Code of Evidence,* Rules 507 (a), 508 (a). On the other hand, since the entries in the hospital record appear to have been made in the normal course of hospital procedure, the whole record, or at least so much thereof as was pathologically germane to the condition of the patient, was clearly admissible under the broad provisions of § 59 of Art. 35. See *Old v. Cooney Detective Agency,* 215 Md. 517, 138 A. 2d 889 (1958). Cf. *Tellez v. Canton R.R.,* 212 Md. 423, 129 A. 2d 809 (1957) [notation on bills of lading are admissible as "business records" against persons who are not parties to them]. In addition—since Dr. Brainin examined and approved all of the entries made by others in the hospital record, including those made by Dr. Abondo regardless of whether they were made under his supervision and direction—there is little doubt that he thereby admitted by adoption that such entries were his own. 4 Wigmore, *Evidence* (3rd ed.), § 1069; 31 C.J.S., *Evidence,* § 282; *Smith v. Reynolds,* 108 Atl. 697 (Vt. 1920). Cf. *Zink v. Zink,* 215 Md. 197, 137 A. 2d 139 (1957). Also compare A. L. I., *op. cit. supra,* Rule 507 (comment b). On the basis of the adoptive admission so much of the hospital record as was not immaterial, irrelevant or otherwise subject to objection was undoubtedly admissible. Cf. *Old v. Cooney Detective Agency, supra.*

For the reasons stated the judgment for costs must be reversed and the case remanded for a new trial.

> *Judgment reversed and case remanded for a new trial; appellee to pay the costs.*