Anthony WILSON, Petitioner,

v.

Frank E. SCOTT, Respondent.

No. A–11180.

Supreme Court of Texas.

Feb. 1, 1967.

———◆———

Groce, Hebdon, Fahey & Smith, Thomas H. Sharp, Jr., with above firm, San Antonio, for petitioner.

Earle Cobb, Jr., San Antonio, for respondent.

## ON MOTION FOR REHEARING

POPE, Justice.

The opinion handed down on November 16, 1966 is withdrawn and the following is substituted.

Plaintiff, Frank E. Scott, sued Dr. Anthony Wilson for failure to make reasonable disclosure of risks incident to a stapedectomy operation. He alleged that his right to refuse the operation upon his left ear was violated because the preoperative warning was not sufficiently full for him to exercise an informed consent, and the operation was unsuccessful. The trial court rendered judgment for Dr. Wilson after sustaining his motion for instructed verdict, but the Court of Civil Appeals reversed that judgment. 396 S.W.2d 532 (1965). Dr. Wilson's points of error in this Court urge that Scott had the burden of proving by expert medical evidence the medically accepted standard for cautioning a patient about risks inherent in the operation, and that the record is devoid of such medically proved standard. We sustain the first point but hold that there was evidence of the medical standard. We affirm the judgment of the Court of Civil Appeals.

Plaintiff has had a hearing defect in his left ear for more than twenty years. He first noticed the problem while a student in high school. For short periods of time he tried to use hearing aids, but he testified that he was not happy with them. Without an aid he could hear conversations, but he said he was sure he missed a part of them. He said that many people who knew him were not aware that he had a hearing loss. The Navy rejected him during World War II by reason of his defective hearing, but the Merchant Marines accepted him.

In 1962 Scott consulted Dr. Wilson who correctly diagnosed the cause of the hearing defect as a bony growth on the stapes bone which inhibited its vibration and dulled Scott's hearing. He recommended a stapedectomy with a vein graft. The operation is relatively new and is regarded as a delicate and complex one. It is performed inside the middle ear through a speculum in an area about the size of a thimble and is done with a special microscope and special instruments. Dr. Wilson is highly trained and has received special instruction in the performance of stapedectomy surgery. He had performed similar ear operations, but Scott's operation was his first stapedectomy with vein graft. Dr. Wilson performed the operation on February 8, 1962, and a few days later Scott lost all hearing in his left ear.

Scott did not allege or prove that Dr. Wilson improperly, negligently or unskillfully performed the operation. He contends

that the operation was elective and not done in an emergency. He says that he made direct inquiry about the risks involved in this operation, but Dr. Wilson did not fully inform him of all of them. Scott acknowledges that Dr. Wilson advised him that ninety per cent of such operations were successful, there was a ten .per cent possibility that his hearing would be no better or could be worse after the operation, and he might sustain an altered sense of taste. Dr. Wilson also told Scott there was a risk associated with the anesthetic from which people sometimes die. Dr. Wilson testified that he specifically warned Scott that one per cent of the patients suffered a total loss of hearing as a result of the operation. Scott alleged and testified that since the operation, he has experienced vertigo, instability, tinnitus, or a roaring in the ear, and total loss of hearing in his left ear. He said that he was warned of none of those hazards.

Scott testified that Dr. Wilson, in discussing the probable results, told him about statistical experiences in terms of "we," from which he inferred that Dr. Wilson had performed this specific operation previously. Although he had performed related operations, Dr. Wilson's former experience with this specific procedure had been confined to experimental operations upon cadavers under the instruction of the originators of the procedure and the best available instructors.

 Physicians and surgeons have a duty to make a reasonable disclosure to a patient of risks that are incident to medical diagnosis and treatment. This duty is based upon the patient's right to information adequate for him to exercise an informed consent to or refusal of the procedure. Salgo v. Leland Stanford Jr. Univ. Bd. of Trustees, 154 Cal.App.2d 560, 317 P.2d 170 (Ct.App.1957); Bowers v. Talmage, 159 So.2d 888 (Fla.App.1963); Natanson v. Kline, 186 Kan. 393, 350 P.2d 1093, on rehearing, 187 Kan. 186, 354 P.2d 670 (1960); 60 Colum.L.Rev. 1193 (1960);

Annot. 99 A.L.R.2d 599 (1965). The nature and extent of the disclosure depends upon the medical problem as well as the patient. In some medical procedures the dangers are great; in others they are minimal. See Atkins v. Humes, 110 So.2d 663, 81 A.L. R.2d 590 (Fla.1959). It has been suggested that some disclosures may so disturb the patient that they serve as hindrances to needed treatment. Patrick v. Sedwick, 391 P.2d 453 (Alaska 1964); Di Filippo v. Preston, 53 Del. 539, 173 A.2d 333 (Sup.Ct. 1961); Natanson v. Kline, supra; Lund, The Doctor, The Patient, and The Truth, 19 Tenn.L.Rev. 344 (1946); Smith, Therapeutic Privilege to Withhold Specific Diagnosis from Patient Sick with Serious or Fatal Illness, 19 Tenn.L.Rev. 349 (1946). Certain disclosures in some instances may even be bad medical practice. Aiken v. Clary, 396 S.W.2d 668, 674 (Mo.1965).

Dr. Wilson recognizes that he owed a duty of some kind, but insists that a part of Scott's burden of proof was the establishment of a standard against which a physician's conduct may be tested, and that the standard is a medical one which must be proved by expert medical evidence of what a reasonable practitioner of the same school and the same or similar locality would have advised a patient under similar circumstances. The standard, says Dr. Wilson, is a medical judgment which includes discretion and an evaluation of scientific and medical data as well as the patient himself. Scott argues that expert medical evidence is unnecessary to the jury's determination that Dr. Wilson departed from the duty standard. Furthermore, Scott contends he actually proved a standard by Dr. Wilson's own expert medical opinion.

A number of cases in other jurisdictions hold that the plaintiff, in an action against a physician for failure to disclose hazards, must prove a medical standard by expert medical evidence. Di Filippo v. Preston, supra; Bowers v. Talmage, supra; Visingardi v. Tirone, 178 So.2d 135 (Fla.App. 1965); Hunt v. Bradshaw, 242 N.C. 517, 88 S.E.2d 762 (1955); Govin v. Hunter,

374 P.2d 421 (Wyo.1962); McCoid, A Reappraisal of Liability for Unauthorized Medical Treatment, 41 Minn.L.Rev. 381 (1957); Comment, 18 Baylor L.Rev. 137 (1966); Contra, 75 Harv.L.Rev. 1445 (1962). Williams v. Menehan, 191 Kan. 6, 379 P.2d 292, 295 (1963) affirmed a judgment for a doctor upon demurrer to the evidence because "The record is devoid of any standard of care required of the defendant doctors." The Supreme Court of Missouri in Aiken v. Clary, supra, 396 S.W. 2d at 674, recently reexamined and overruled its former decision in Mitchell v. Robinson, 334 S.W.2d 11, 79 A.L.R.2d 1017 (Mo. 1960). *Mitchell* had inferred that lay testimony was sufficient to establish the standard for medical practitioners in warning about risks. After first holding that the plaintiff has the burden to prove the standard, the Court wrote:

"We have reexamined this question and have concluded that the question of what disclosure of risks incident to proposed treatment should be made in a particular situation involves medical judgment and that expert testimony thereon should be required in malpractice cases involving that issue. The question to be determined by the jury is whether defendant doctor in that particular situation failed to adhere to a standard of reasonable care. These are not matters of common knowledge or within the experience of laymen. Expert medical evidence thereon is just as necessary as is such testimony on the correctness of the handling in cases involving surgery or treatment. In Fisher v. Wilkinson, Mo., 382 S.W.2d 627, 632, we held: 'Without the aid of expert medical testimony in this case a jury could not, without resorting to conjecture and surmise or by setting up an arbitrary standard of their own, determine that defendants failed to exercise their skill and use the care exercised by the ordinarily skillful, careful and prudent physician acting under the same or similar circumstances.' And, as we said in Pedigo v. Roseberry, 340 Mo. 724,

736, 102 S.W.2d 600, 607: 'Juries should not be thus turned loose and privileged to say, perchance, the method of treating an injury * * * [or an illness] was negligent notwithstanding, for instance, the uncontradicted competent testimony establish[ing] that the uniformly adopted practice of the most skillful surgeons [or physicians] had been followed.' The question is not what, regarding the risks involved, the juror would relate to the patient under the same or similar circumstances, or even what a reasonable *man* would relate, but what a reasonable *medical practitioner* would do. Such practitioner would consider the state of the patient's health, the condition of his heart and nervous system, his mental state, and would take into account, among other things, whether the risks involved were mere remote possibilities or something which occurred with some sort of frequency or regularity. This determination involves medical judgment as to whether disclosure of possible risks may have such an adverse effect on the patient as to jeopardize success of the proposed therapy, no matter how expertly performed. * * *"

We conclude therefore that the plaintiff had the burden to prove by expert medical evidence what a reasonable medical practitioner of the same school and same or similar community under the same or similar circumstances would have disclosed to his patient about the risks incident to a proposed diagnosis or treatment, that the physician departed from that standard, causation, and damages. The action is one of malpractice for a physician's failure to conform to medical standards in obtaining the patient's consent. Regardless of what some earlier informed consent cases suggest, such an action need not be pleaded as one for assault and battery. The traditional elements of assault and battery, unlawful use of violence upon another and intent to injure, are absent in most malpractice cases based upon a physician's failure to make sufficient disclosure. McCoid, A Reap-

praisal of Liability for Unauthorized Medical Treatment, 41 Minn.L.Rev. 381, 422 (1957); Comment, 18 Baylor L.Rev. 137 (1966); Note, 44 Tex.L.Rev. 799.

■ There remains the question of whether Scott proved a medical standard for disclosure in stapedectomy operations. Scott contended that Dr. Wilson should have advised him more fully about such additional risks as vertigo, instability, tinnitus, loss of taste, a one per cent chance of total loss of hearing, and that he had not previously performed this operation. The Court of Civil Appeals held that Scott proved a medical standard for disclosure because Dr. Wilson agreed with a statement contained in a medical textbook written by Dr. Philip E. Meltzer. Dr. Meltzer wrote, concerning stapedectomy operations, "The public has been educated to believe that modern science and ingenuity have solved their ills, and without risk. They need not be discouraged from assuming this risk, but they certainly should be aware of it." Since this is a case in which the patient urges that the physician gave some significant warnings but failed to mention other risks, Dr. Wilson's agreement with Dr. Meltzer's general statement of the abstract rule did not establish a medical standard.

■ Dr. Wilson was called as an adverse witness, and by his own testimony he established the medical standard. He denied that it was standard medical practice to advise a stapedectomy patient about such effects as vertigo, instability, and tinnitus. His position about those effects was that they are only temporary results which normally follow the operation. Neither Dr. Wilson nor any other witness testified about a medical standard for disclosure to a patient about the surgeon's experience with a specific operation. Dr. Wilson, however, was asked whether he advised Scott about the chances of a total loss of hearing in the ear. This was the testimony:

"Q. But you are sure you told him it might result in complete loss of the hearing in the ear?

A. Yes. This is a very standard thing that is told to all patients.

Q. How did you tell him that? What words did you use?

A. Well, it is explained to the patients who are very good candidates for this surgery that they have a 90 percent chance of achieving good hearing in the ear following surgery; there is a 10 percent, approximately 10 percent chance of no increase in the hearing; and a 1 percent chance of loss, the way that I would explain it, loss of the hearing in the ear. This is for good candidates.

A. Good candidates.

* * * * * *

Q. And you are saying that you are sure you told him that because you always tell people that or do you remember telling him that?

A. This is what I was taught, and I remember telling him that. * * * This is a standard procedure."

■ Dr. Wilson testified that standard medical practice would have included advice about the chance of Scott's total loss of hearing. Dr. Wilson said that he so advised Scott, but Scott denied that he was so informed. There was direct evidence of the vital fact that Dr. Wilson failed to conform to the standard medical practice which his own testimony established. Humphreys v. Roberson, 125 Tex. 558, 83 S.W.2d 311 (1935); McDermott v. Manhattan Eye, Ear & Throat Hospital, 15 N.Y.2d 20, 255 N.Y.S.2d 65, 203 N.E.2d 469 (1964); State for Use of Miles v. Brainin, 224 Md. 156, 167 A.2d 117, 88 A.L.R.2d 1178 (1961).

■ Scott, by cross-assignment, says the trial court erred in excluding the testimony of Dr. Meredith Mallory his expert witness. Dr. Mallory was no longer a practicing physician but was engaged in business. He

had no special knowledge of the diseases and treatment of the eye, ear, nose and throat and was unfamiliar with stapedectomy operations or medically accepted standards for caution of the hazards in such an operation. The trial court did not abuse its discretion in excluding his testimony. 2 McCormick & Ray, Texas Law of Evidence, § 1401, (2d ed. 1956).

We affirm the judgment of the Court of Civil Appeals which reversed the judgment of the trial court and remanded the cause for trial. Both motions for rehearing are overruled. The parties may file a second motion for rehearing within fifteen days.

GRIFFIN, SMITH and HAMILTON, JJ., dissenting.

## DISSENTING OPINION

SMITH, Justice.

I respectfully dissent. The trial court's action in granting Wilson's motion for instructed verdict should be sustained because there is no evidence that Wilson failed to give that *warning* to Scott that would have been given by medical doctors of ordinary knowledge and skill in the San Antonio area and vicinity or in a similar vicinity in 1962 under the same or similar circumstances.

In the beginning, I call attention to the cause of action stated by the plaintiff, Scott, in his pleadings. Scott sought recovery upon three alternative theories. Scott alleged 21 different acts of negligence on the part of the doctor and that "as a proximate result of the operation or as a proximate result of one or more of the foregoing acts of negligence, Scott suffered damages."

Scott alleged that the doctor was guilty of fraud in representing that he was thoroughly experienced in performing a stapedectomy and that a "stapedectomy with vein graft and polyethylene prosthesis was a safe and proven operation when in fact it was an experimental operation condemned by some of the most prominent experts and authorities. Had Scott been informed of this fact, he would not have submitted to the operation." Scott's third theory of recovery was that "[a]lthough Scott had specifically inquired of Dr. Wilson prior to the operation whether there was danger of disability, Dr. Wilson stated that there was none other than the normal risk of taking anesthetics and possibly some slight loss of taste. In truth and in fact the risk of nerve deafness, tinnitus, vertigo, dizziness and other nervous disorders were well-known to Dr. Wilson, and the operation was still in the experimental stage. Dr. Wilson's failure or refusal to advise and inform Scott of such facts made it impossible for Scott to know and understand the nature of the operation or to give a knowledgeable consent to such operation. Had Scott been informed of such facts, he would not have consented to said operation. *Such operation* constituted an *assault and battery.*" Emphasis added.

Thus, liability was predicated upon three basic theories: (1) misrepresentation or fraud, (2) assault and battery and (3) negligence.

The trial court granted the doctor's motion for instructed verdict. On appeal to the Court of Civil Appeals, Scott presented the following basic points:

"The trial court erred in instructing the jury because there was sufficient evidence to support a jury verdict for plaintiff based on fraud."

"Second Point of error: The trial court erred in instructing the jury because there was sufficient evidence to support a jury verdict for plaintiff based on *assault and battery.*" Emphasis added.

Scott did not complain in the Court of Civil Appeals of the action of the trial court in sustaining the doctor's motion for instructed verdict on the ground no evidence was introduced showing negligence. Therefore, the negligence theory as to the man-

ner in which the doctor performed the operation is not before this Court. The Court of Civil Appeals, in effect, held this was not a fraud case. Therefore, the fraud theory is not before this Court, since Scott did not complain of such action. This leaves Scott with only his self styled "assault and battery" theory.

The Court of Civil Appeals in recognizing such a theory said:

"The consent which Scott gave to have the operation performed is of no effect unless it was an informed and knowledgeable consent. There is no question here as to Scott's being injured and suffering damages as a result of the operation."

"If Dr. Wilson did not have Scott's informed consent to operate upon him he would be guilty of assault and battery on Scott, and liable for the damages caused by the operation. Moss v. Rishworth, Tex.Com.App., 222 S.W. 225."

The Moss case was one where the operation was performed upon an eleven year old child without her consent and the consent of her parents. The Court held that "as the child, on account of her minority, could not, and the parents did not, give consent, had she survived the operation, she would have had a cause of action as for a technical assault and battery, and that therefore the parents, in virtue of article 4695, R.S.1911 have a cause of action." Ours is not an assault and battery case. Here written consent was given the only contention being that Scott did not give his informed consent. Scott admits that the doctor warned him in four different ways there could be an imperfect result. Scott testified, contrary to his pleadings, that the doctor told him (1) "we have had 90% success with this operation with a person of your qualifications; (2) that there was a 10% possibility that his hearing would be no better or could be worse; that he would have an altered sense of taste and (3) that there was a risk associated with the anesthetic and that people had died from it. There is no showing by lay or medical testimony that these warnings were untrue. The warnings given cannot be classified as misrepresentations. They are representations and warnings made by the doctor to his patient prior to surgery. This is a case of first impression in Texas, but I find no case decided in other jurisdictions that holds a doctor is under a duty to state in precise words that there probably would be 1% who would sustain a complete loss of hearing as a result of the stapedectomy. Nor do I find any cases which sustain Scott's apparent theory that to be an informed consent that the doctor is required to relate all of the dangers associated with the operation, such as 1% of patients sustain a complete loss of hearing, or that tinnitus, vertigo, dizziness and other nervous disorders probably would follow the operation.

Whether or not a physician or surgeon is under a duty to warn a patient of the possibility of a *specific* adverse result of a proposed treatment or operation depends upon *the circumstances of the particular case, and of the general practice with respect to such cases followed by the medical profession in the locality*. The custom of the medical profession to warn must be established by expert medical testimony.

It is not the duty of a physician in this type of case to relate specific adverse results that might obtain after surgery. The physician's duty to disclose is limited to those disclosures which a reasonable medical practitioner would make under the same or similar circumstances.

The Court is here holding that since Dr. Wilson testified that it was a standard procedure to tell a patient, and that he was sure he told Scott that there was "a 1% chance of loss, * * * of the hearing in the ear," the doctor was under a duty to relate specific adverse results. This is not in harmony with the decided cases. In so holding, the Court is relieving Scott of the burden of proof which stays with him throughout the trial. The Court, merely because Dr. Wilson thinks he told Scott

about the 1% total loss of hearing, and Scott says the doctor did not mention the 1%, has relieved Scott of the burden of establishing by expert testimony of medical witnesses that the disclosures which were admittedly made were not in accordance with those which a reasonable medical practitioner would make under the same or similar circumstances. See Natanson v. Kline, 186 Kan. 393, 350 P.2d 1093, rehearing denied, 187 Kan. 186, 354 P.2d 670 (1960); Williams v. Menehan, 191 Kan. 6, 379 P.2d 292 (1963). *Kline* was a case where the physician failed in his legal duty to make any disclosure whatever to the patient of the dangers and hazards inherent in the proposed treatment. The Court held:

> "Whether or not a physician has advised his patient of the inherent risks and hazards in a proposed form of treatment is a question of fact concerning which *lay witnesses* are competent to testify, and the establishment of such fact is *not dependent upon expert medical testimony*. It is only when the facts concerning the actual disclosures made to the patient are ascertained, or ascertainable by the trier of the facts, that the expert testimony of medical witnesses is required to establish whether such disclosures are in accordance with those which a reasonable medical practitioner would make under the same or similar circumstances."

In *Williams,* the Kansas Supreme Court said:

> "At the outset it may be stated that all of the parties rely on our recent case of Natanson v. Kline, 186 Kan. 393, 350 P. 2d 1093, rehearing denied 187 Kan. 186, 354 P.2d 670, the parties seeking to place a different construction on what was said with reference to informed consent. We said in the Natanson case at page 406 it is the duty of a doctor to make a reasonable disclosure to his patient of the

nature and probable consequences of the suggested or recommended treatment, and to make a reasonable disclosure of the dangers within his knowledge which are incident or possible in the treatment he proposes to administer. But this does not mean that a doctor is under an obligation to describe in detail all of the possible consequences of treatment. To make a complete disclosure of all facts, diagnoses and alternatives or possibilities which might occur to the doctor could so alarm the patient that it would, in fact, constitute bad medical practice."

The cases from other jurisdictions draw a distinction as to the type of proof required where the doctor gave *no* warning and where the doctor gave *some* warning. It is my position that Dr. Wilson has made no admission in this case which would forego the necessity of proof by Scott that where there is testimony regarding the type or extent of warning given the patient (Scott in this instance), then the expert testimony of medical witnesses is required to establish whether such disclosures are in accordance with those which a reasonable medical practitioner would make under the same or similar circumstances. By his testimony, the doctor has not waived this requirement. The question of whether or not a surgeon is under a duty to warn a patient of the possibility of a specific adverse result of a stapedectomy depends upon the general practice followed by the medical profession and not upon the personal opinion of a layman. See Govin v. Hunter, 374 P.2d 421 (Sup.Ct.Wyoming, 1962). The question of whether or not Dr. Wilson mentioned the 1% total loss possibility is not an ultimate issue in this case.

I would reverse the judgment of the Court of Civil Appeals and affirm that of the trial court.

GRIFFIN and HAMILTON, JJ., join in this dissent.